## BONERT v. LONG ISLAND R. CO.

(Supreme Court, Appellate Division, Second Department. June 16, 1911.)

1. RAILROADS (§ 348*)—COLLISIONS AT CROSSINGS—NEGLIGENCE—EVIDENCE.

In an action against a railroad company for injuries in a collision with a train at a crossing, evidence *held* not to support a finding of actionable negligence.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1138–1150; Dec. Dig. § 348.*]

2. RAILROADS (§ 348*)—COLLISIONS AT CROSSINGS—CONTRIBUTORY NEGLIGENCE —EVIDENCE.

In an action against a railroad company for injuries in a collision with a train at a crossing, evidence *held* not to support a finding of freedom from contributory negligence.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1144–1149; Dec. Dig. § 348.*]

Woodward and Rich, JJ., dissenting.

Appeal from Trial Term, Suffolk County.

Action by Lucile C. Bonert against the Long Island Railroad Company. From a judgment for plaintiff, and from an order denying a new trial, defendant appeals. Reversed, and new trial granted.

Argued before JENKS, P. J., and THOMAS, CARR, WOODWARD, and RICH, JJ.

Timothy M. Griffing, for appellant.
I. R. Oeland, for respondent.

THOMAS, J. The plaintiff, in company with another young woman, was driving an automobile of the runabout type, about 5:15 o'clock in the afternoon of February 4th, and as the forward wheels of her car were 6 or 7 feet from the south rail of defendant's single track railway, she saw the headlight of a locomotive bringing a train from the East, and, after doing all in her power to stop her car, its forward wheels entered upon the track and she became unconscious. There is the usual accusation that signals were not given from the locomotive of the defendant, dependent, save as to the parties immediately involved, upon testimony of those unobservant persons who environ the locality of a collision at a railway crossing.

[1] In the present case the plaintiff and her companion, Miss Collins, testified to listening attentively without hearing the signals. There was some reason for their failure to hear, viz., the noise of the car and that of the machinery in the icehouse, which was from 120 to 125 feet easterly from the highway. But, even so, it is difficult to understand the failure or inability of the travelers to hear what other persons not disposed to favor the defendant heard, unless it be concluded that the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

plaintiff and her friend listened for an approaching train as indifferently as they looked for it. Long, a farmer, was following them at a distance of 500 or 600 feet, neither taking notice of or listening for an approaching train. He heard no signal. One Stoll, prevented by the pumping in the icehouse where he was, heard no whistle, not even the danger whistle. Steigerwald, whose residence plaintiff passed as she approached the crossing, heard the signal in Bayport, the next eastward station, but heard no more, because, as he states, he "was in the stable" and paid "no attention to the train." Who did hear the train? The distance from Bayport to this crossing is about 1½ miles and the intervening track is straight. On the locomotive was an automatic bell ringing while the train was in motion. The first whistling post as the train approaches the crossing is 1,320, and the second 510, feet therefrom. As the engineer stated, he whistled at both posts, and blew the whistle again when he saw the wheels of the automobile on the track. The fireman states that he heard these whistles, and if it has come to this, that a jury may reject evidence of men in the defendant's service that signals were given at the whistling posts as the rules of the company require, and as accords with the usual practice, then recourse may be had to the evidence of those in the neighborhood, who not only heard the whistles, but saw the train at a distance, and some of whom called out in warning to the young women, who pursued their way, alert, as they testify, for a coming train, but seeing and hearing none, and hearing no warnings.

Miss Shattuck and Miss Girard, together walking south, and finally meeting and speaking to plaintiff, after passing the track heard a whistle. Miss Shattuck heard one "quite a ways from the crossing," and then another whistle, part of it before the engine "got to the ice plant," and the last of it "just disappearing behind the ice plant." Here is an acquaintance of the plaintiff assuring the truth of the engineer's statement. Miss Girard noticed the headlight of the engine as she was crossing the track, and near the track she heard a whistle, "probably a little to the east of the bridge," and a second whistle when about 100 feet from the track, the last of which was heard as the engine disappeared behind the icehouse. Trinkwald was near the track, and saw the train east of the bridge, heard the whistle down at the bridge, and another just east of the icehouse, and waved his hand and "hollered as loud as" he could to the plaintiff and her friend. Steigerwald, brother of the plaintiff's witness, was on the west side of the ice plant, similarly heard the two whistles, and saw the women approaching the crossing, and waved and called out to them. Slager, living near the crossing, heard the two whistles, and cried a warning to the two ladies, and heard the call of the man at the ice plant. Miss Shattuck and Miss Girard heard the warning. How, then, in view of this evidence, can it be said that the signals were not given? And, if they were given, they were sufficient.

The engineer states that this and all crossings are dangerous, and it may be so. The jury was not warranted in finding that the bell on the engine was not constantly rung and the two whistles blown, and if the finding accords with the weight of evidence the jury must have

concluded that the signals were insufficient in the exercise of ordinary care. What more was required? It is impossible to lay aside practical knowledge gathered from the numerous instances of crossing accidents that have come to the courts, as well as that gained from actual experience of crossing signals, and it is evident that all was done in this case that the protection of the traveling public has required in the past under similar circumstances.

[2] Moreover, the presence of the plaintiff upon the track indicates an absence of such vigilant looking as requisite care required. For from 30 to 34 feet before the first rail was reached there was an uninterrupted view to the eastward in crossing for a distance from 1,300 feet to a mile. The icehouse is 100 feet in length and 30 feet in width, with a coal bin attached on its westerly end, the dimensions of which are about 20x30 feet, with a height over 10 feet. Between the coal bin and the highway are six or seven trees of medium growth, and of a height extending towards the south of 15 or 16 feet, while eastward of the icehouse, towards Bayport, are a stable, some outhouses, trees, and poles for carrying wires. All these objects to some degree impair the view to the eastward, and in certain relations to the icehouse the view is prevented. Eastward of the crossing there is a depression of the track, deepest 700 feet from the crossing, where its depth is 4 feet, which very slightly impairs a view of an approaching train.

The plaintiff, quite familiar with the crossing, as she says, started to listen 500 feet from the track, and so continued until she was struck, and began to look both ways 100 feet from the track. The day, she states was very foggy, and, although the evidence does not sustain such statement, that at the time, quarter after 5, it was just dusk. She heard the wagon behind her, the heavy pumping in the icehouse, her car was making some noise, the buildings and other objects intermittently obstructed her view until she was some 30 feet from the track, and over this and a still greater distance she states she was continually listening and looking to the west and to the east. Of what avail is it to state that she was constantly looking while passing over this distance, when the train was before her eyes? If she looked, she saw the train. If she saw the train with her automobile under control, she should have stopped. If it was not under control, it should have been. The fact that she did not see the train until it was 60 or 70 feet away, and she was 6 or 7 feet from the crossing, shows that the truth of the matter is that she did not look with suitable care. The earlier partial obstructions required increased care when free outlook was afforded her, and the fact that others saw or heard the train at a long distance, and cried out in warning to her, and that the locomotive was first seen by her as it rose up in close and menacing proximity, and that she still drove upon the track, so feeble was her control of her car, proves irresistibly with what degree of care she was performing a traveler's duty. The finding as to her contributory negligence and the defendant's negligence are against the weight of the evidence and demand a reversal of the judgment.

There are certain rulings that, as defendant urges, demand reversal.

One of them relates to the attempt to prove the value of the destroyed automobile by evidence of its cost. Its condition before the accident was shown, and its destruction proven. From this the jury could ascertain the loss so far as practicable. While bills rendered for services by a physician are not evidence, it is understood that the reasonable value of the services was proven by a physician rendering or having knowledge of them, and the error is immaterial, and the usual price of the exercising machine was some evidence of its value. The father paid all the bills; but, in the absence of evidence that he incurred them, I consider that the presumption is that obligation to pay rests on the person to whom the services were rendered.

For the errors stated, the judgment and order should be reversed, and a new trial granted; costs to abide the event.

JENKS, P. J., concurs. CARR, J., concurs in result. WOODWARD and RICH, JJ., dissent.