[No. 28381. Department Two. December 15, 1941.]

MARTHA P. BYERLEY, as *Administratrix, Respondent*, v. NORTHERN PACIFIC RAILWAY COMPANY *et al.*, *Appellants.*[1]

[1]Reported in 120 P. (2d) 453.

*Robert S. Macfarlane, Dean H. Eastman, Earl F. Requa,* and *Rigg, Brown & Halverson,* for appellants.

*Richards, Conklin & Delle,* for respondent.

JEFFERS, J.—This is an appeal by defendants, Northern Pacific Railway Company, W. A. Dalberg, and C. F. Montgomery, from a judgment entered by the superior court for Yakima county on the verdict of a jury, in favor of Martha P. Byerley, administratrix of the estate of Jess Byerley, deceased, after a motion for

judgment notwithstanding the verdict or in the alternative for a new trial had been denied, in an action instituted by plaintiff on behalf of herself and minor daughter, to recover damages for the death of Jess Byerley, the husband and father, who was killed at a grade crossing in Yakima, where I street crosses the tracks of defendant company.

The complaint alleges negligence on the part of defendant company, in placing the crossing's automatic wigwag signal and bell at a point not readily observable to one approaching the crossing from the east in an automobile; in operating its train at a speed of fifty to sixty miles per hour; and in failing to give the statutory whistle and bell, as by law required. The complaint further alleges that the view to the north, as one approaches the crossing from the east, is obstructed by a building of the Standard Oil Company, by poles along the right of way, by a small building, by bushes, and by an orchard.

The answer denies the allegations of negligence in the complaint, and alleges that Jess Byerley was guilty of contributory negligence. The reply denies the allegations of the affirmative defense set up in the answer.

Error is based upon the denial by the court of appellants' challenge to the legal sufficiency of the evidence and motion for dismissal with prejudice made at the close of respondent's case in chief; upon the denial of appellants' challenge to the legal sufficiency of the evidence to entitle respondent to recover; upon the denial of appellants' motion for a directed verdict in their favor made at the conclusion of all the evidence; upon the denial of appellants' motion for judgment notwithstanding the verdict; upon the denial of appellants' motion for new trial; and upon the entry of judgment for respondent on the verdict.

■ Both Mr. Byerley and T. E. Slagle, who was working for the former, were killed in this accident, and the evidence does not show which one of these men was actually driving the truck at the time of the collision. It does appear, however, that the truck was under the complete control of Mr. Byerley, and therefore it would make no difference which one of them was actually driving it, as the negligence of the driver would be imputed to Mr. Byerley. The court and all parties to this action have therefore treated the matter as though Byerley was the driver of the truck at the time of the accident.

At the time of the accident, Mr. Byerley was, and for about two and one-half years had been, foreman of the Guy C. Finley ranch, at Selah.

I street is a part of the usually traveled route from Selah to what is referred to as "produce row," in the city of Yakima. It is a heavily traveled street. As one proceeds west on this street, toward the crossing in question, the view to the north is entirely obstructed, until a point is reached on the highway almost opposite the southwest corner of a building of the Standard Oil Company. It appears from photographs and drawings introduced in evidence, that I street crosses four tracks of appellant company. Other physical features also appear from these exhibits.

The main line track on which the collision occurred is the third track from the east. In other words, in traveling west on I street, one crosses two tracks before reaching the main line track. The testimony is undisputed that it is forty-six feet from the southwest corner of the Standard Oil Company building to the center of the main line track, measured on a line paralleling the southerly end of the building and the highway. It is also undisputed that it is 293 feet from the wigwag signal and bell to the Valley Evaporator plant, and 118

feet from the signal to the office of the Union Oil Company. Exhibits Nos. 1 and 16 are large drawings showing the crossing and surrounding physical features.

Exhibit No. 14 is a large photograph taken from a point thirty-five feet east of the center line of the main track on I street, and shows a train standing on the main track 255 feet north of the crossing. Exhibit No. 12 is a photograph taken from a point on I street forty feet east of the center of the main line track, and shows a train standing on the main line track 514 feet north of the crossing. Exhibit No. 11 is a photograph taken from a point on I street twenty-five feet east of the center line of the main track, and shows a train standing on the main track 674 feet north of the crossing. Exhibit No. 13, a photograph taken from a point on I street, fifty feet east of the center of the main line track, shows the front of a train standing 514 feet north of the crossing.

Exhibit No. 7, a photograph taken from I street, at a point two hundred feet east of the center of the main track, shows, among other things, the wigwag signal located just east of the crossing, and on the south or left side of I street. This picture shows the signal attached to an arm extending toward the street from a striped pole, and above the signal arm can be seen the following words: "Stop, Look and Listen. Railroad Crossing." It appears conclusively from exhibits Nos. 11, 12, 13, and 14, that a train is plainly visible at the respective distances north of the crossing from the point on I street from which the pictures were taken.

There was no presumption of due care in this case, in view of the fact that there were three disinterested witnesses who saw and observed both the train

and the truck just prior to and up to the time of the collision. No instruction on the presumption was given.

The accident occurred about two p. m., on August 9, 1939. The day was clear. The three witnesses to the accident were Woodrow Groenig, called by respondent, and Oscar Singert and John Millius, called by appellants. Mr. Groenig testified in substance as follows: That on the day of the accident he was working for the Valley Evaporator Company, in its plant to the north and west of the crossing (which the testimony shows was 293 feet from the wigwag signal); that he heard the signal bell ring, and stepped out on the back porch of the building, from which point he had a clear view up the track and of the crossing; that he saw the train first, and then saw the truck as it was coming out from behind the Standard Oil Company building; that when he first saw the truck it was not yet on the first track, and was going slowly; that he looked back at the train, and it was just north of the semaphore, which is 977 feet north of the crossing. The witness further testified that the truck was traveling about as fast as a person walks; that he thought the truck would stop; that he looked back at the train again, and it was half way down to the crossing from the semaphore; that the truck did not stop, and was struck by the train about the rear right wheel. He estimated that the train was going between fifty and fifty-five miles per hour. Mr. Groenig further testified that he heard the bell in connection with the wigwag signal; that he heard the train whistle before he saw the truck, and that it continued to whistle up to the time of the collision; that there was no change in the speed of the truck until it got on the main line track, when it seemed to speed ahead just before the train struck it; that, when he heard the signal bell ringing, the wigwag signal was going back and forth.

Oscar Singert testified that, on August 9, 1939, he was employed by the Union Oil Company, and was working in its office, which is on the west side of the Northern Pacific tracks, south of I street (which the testimony shows is 118 feet from the wigwag signal). This witness testified that he was looking out the window of the office, and was first attracted by the signal arm; that the signal arm was working when he noticed the train was coming, and the signal bell was ringing; that he saw the Ford truck approaching after he noticed the signal arm; that when he first saw' the truck it was right at the corner of the Standard Oil Company building, at which time the truck was slowing down, but did not come to a stop; that the truck slowed down to about five miles per hour, and then it looked as though the driver either stepped on the gas or shifted gears, as it spurted up; that he heard the train whistle, and it was still whistling when the truck was hit; that the truck appeared to cut over to the left just before it was hit; that the train was probably going fifty miles an hour.

John Millius testified that he was a trucker, and on the day of the accident he came down I street from the east and turned south on Front street, parking just off I street; that he saw the truck coming down I street, and saw the collision; that the truck made a full stop about twenty-five or thirty feet east of the first track, which is a spur track. The witness then put his initials on exhibit No. 16, at the point on I street where he thought the truck stopped. He further testified that, at the time the truck stopped, the wigwag signal was working, and the bell was ringing; that he heard the train whistle, and heard it coming; that he noticed the truck

"   . . . kind of sneaking up from behind that plant [Standard Oil plant] to see if he could see the train coming. Well, the next thing I knew, the truck was

starting up and was bucking as it was going along.
. . . Just as if he stepped on the gas or tried to
shift gears or stepped on the throttle too hard;"

that the next thing he knew the train hit the truck in
the back rear wheel; that he heard the train whistle;
that there were other cars behind the truck, but they
remained where they were. .

This witness further testified on cross-examination
that he was parked about one hundred feet from the
track; that, at the time the truck stopped, he could
not see the train because of the building; that the
train was going about fifty miles an hour.

In addition to the witnesses above mentioned, Robert
Smith testified that he was familiar with the I street
crossing, and on the day of the accident he had pulled
up on I street, on the west side of the crossing, when
the train was about one-eighth of a mile from the cross-
ing; that when he pulled up the wigwag signal was
working and the bell ringing, and he saw the train
coming when it was between four and five blocks to
the north; that he heard the train whistle; that he had
no difficulty in hearing the whistle or the signal bell,
nor in seeing the wigwag signal; that he did not see the
collision, as he was parked behind a car which had
started to back up, and he was watching this car just
before the train reached the crossing; that he thought
the train was going about forty miles an hour; that
he heard the collision. On cross-examination he fur-
ther testified that he first noticed the train after it
had whistled; that he considered a block to be about
three hundred feet, and that the train was nine hun-
dred to one thousand feet north of the crossing when
he first saw it. On redirect examination Mr. Smith
further testified that he passed over this crossing every
day, and that he never had any trouble in seeing the
wigwag signal, except late in the evening when the

sun is low and hits one's eyes, and that he had no trouble in hearing the signal bell.

From this testimony, it appears conclusively that Mr. Groenig, who was 293 feet west and north of the automatic signal, heard the bell and saw the wigwag signal working, as did Oscar Singert, who was 118 feet west and south of the crossing, and Mr. Millius, who was one hundred feet east and south of the crossing, and Mr. Smith, who was on I street west of the crossing, waiting for the train to pass. All of these men also heard the train whistle.

Henry B. Shuk, called by respondent, testified to making an experiment at this crossing in the spring of 1940, with a truck similar to the one involved in the accident. The testimony of this witness was to the effect that, as he was driving up to the crossing from the east, with the window of his car down, he could not hear the bell on the wigwag signal because of the noise of his truck; that he heard the whistle of an approaching train when he was right up close to "it." We presume he meant the crossing. He stated that the wigwag signal was not visible at all times to one approaching the crossing from the east. The explanation of the witness was as follows:

"Well, as you approach it, it goes out of your line of vision from the pillar of the truck on the side, from both that and the inclosed part of the cab, for a certain length or distance;"

that the signal passes out of view when one is about opposite the Standard Oil Company building, and ninety feet east of the crossing; that, coming out from behind the Standard Oil Company building, one has a partial view to the north, almost to a small building called the telephone house, which according to the testimony and as shown by exhibit No. 16, is located about five hundred feet north of the crossing.

It is difficult to follow the testimony of this witness because of his reference to physical objects without locating them by any mark. Apparently the main obstructions to the view of one when he first comes from behind the Standard Oil Company building are the poles, or a pole, along the right of way up to the four by four telephone house. This witness further testified that one could not get an unobstructed view until he had almost reached the main line track.

There was some testimony that beyond the telephone house there were an orchard and some bushes, which obstructed the view, and that south of the telephone house there were bushes along the track.

L. L. Buchanan, who was with Mr. Shuk at the time the experiment was made, testified that, when they came within about sixty or eighty feet of the signal, they could not see the signal on account of the post on the left-hand side of the car; that the signal could be seen further back, but not at that point. He stated that, when they reached a point just past the Standard Oil Company building, they could hear the signal bell. As we understand the testimony of this witness, he further testified that, when a person reaches the first track, he can see up north to about the telephone house, but cannot see clear up the main line track until he reaches a point between the second track and the main line track; that, if the car windows are closed, the signal bell cannot be heard until the car is past the Standard Oil Company building, but if the car windows are open, "Why, you can hear it I don't know just how far up."

A. M. Samuelson, called by respondent, testified that he had used this crossing for twenty years, and that it was not possible to see up the main line track until one got west of the Standard Oil Company building, and

that the sound of a train whistle appeared to be farther away than it really was.

The court took from the jury the question of any negligence of appellant company based upon the claimed failure to whistle or ring the bell for the crossing. We have before us for consideration, then, the contention of appellants that Mr. Byerley was guilty of contributory negligence and that the trial court should have so found as a matter of law, and the contentions of respondent that appellant company was guilty of negligence in placing the automatic signal at this crossing at a point where it was not clearly visible to one approaching from the east in an automobile, and in operating its train over the crossing at an excessive rate of speed, and that such negligence on the part of appellants was the proximate cause of the accident.

We shall first discuss the claimed negligence of appellant company relative to the automatic signal.

Rem. Rev. Stat., Vol. 7A, § 6360-102 [P. C. § 2696-860], Laws of 1937, chapter 189, p. 904, provides:

"Whenever any person operating a vehicle approaching any railroad grade crossing or structure with a movable span and a clearly visible electrical, mechanical or manual signal device is in operation and gives warning of the immediate approach of any train or operation of movable span, the operator of such vehicle shall stop within 50 feet, unless vehicles ahead require a greater distance, but not less than twenty (20) feet, from such railroad or span and shall not proceed until he can do so safely. The operator of any vehicle shall stop his vehicle and remain standing and not traverse any railroad grade crossing or structure when crossing gate is lowered or when a human flagman or mechanical or electrical signal gives or continues to give a signal of the approach or passage of any train or movement of the span."

It is not contended by respondent that the wigwag

signal was not working, or that the signal bell was not ringing, but her contention is that the warning signal was not clearly visible to one approaching the crossing on I street, and further that the signal bell was not loud enough to be audible to one approaching in a truck.

There is no testimony that Mr. Byerley ever stopped his truck before proceeding on to this crossing, except that of Mr. Millius, who testified that he stopped about twenty-five or thirty feet east of the first or spur track, at which point it is clear from the exhibits showing the physical conditions, that he could not see up the main line track.

There was no showing that this automatic signal was not a standard device, nor was there any showing that the railroad company was required to place it in any particular location, other than where it was clearly visible.

In our opinion, the testimony of the men who made the experiment, that the signal was not visible at a certain point because of the posts in the car, does not amount to even a scintilla of evidence. If it is true, as contended by respondent, that an automatic signal is not clearly visible because, at some point as one approaches a crossing in an automobile, the signal is obscured by the posts in the windshield of his car, then in our opinion, no such signal has ever been, or ever can be, so placed as to be clearly visible.

We are clearly of the opinion that the testimony is conclusive that, at the time of the accident, the wigwag signal was clearly visible to Mr. Byerley as he approached the crossing; that it was working, and that the bell in connection therewith was ringing loudly enough to be heard a distance of 293 feet. In our opinion, if Mr. Byerley did not see the signal, it was because he did not look, and it cannot be contended

that he looked and did not see that which he must have seen had he looked. We are also satisfied that, had he listened, he must have heard the signal bell.

The signal being clearly visible and working, it must be presumed that Mr. Byerley knew the law required him to stop and let the train go by.

We have many times held that there must be substantial evidence to support a verdict. *DeTemple v. Schafer Bros. Logging Co.,* 169 Wash. 102, 13 P. (2d) 446. There was no substantial evidence to support a verdict based on the claimed negligence of appellant company in placing or maintaining this automatic signal, as in our opinion the testimony conclusively shows that the company complied with the statute, both as to the signal being clearly visible and clearly audible.

We now come to the contributory negligence, if any, of Mr. Byerley, and the claimed negligence of appellants in operating the train over the crossing at an excessive and unlawful rate of speed.

The trial court did not specifically mention this automatic signal in its memorandum opinion, but seemed to be of the view that, under the reasonable margin of safety rule, it could not be said, as a matter of law, that Byerley was guilty of contributory negligence. We seriously doubt that the reasonable margin of safety rule could or should be applied in favor of one approaching a railroad crossing such as the one in question, having a standard automatic signal device, which is clearly visible and operating at the time. We have never so held, nor have we been cited to any case so holding.

In its memorandum opinion, the trial court stated that, where a railroad track crosses a public highway, motor vehicles along the road and railroad trains along the tracks have equal rights to the use of the crossing,

their duties are mutual and reciprocal, and each must exercise care for the safety of the other; that reasonable care, under the circumstances, is the general doctrine, in actions of negligence, as to the nature of one's duty, and the rule is that a driver of an automobile about to cross a railroad track shall exercise such care as a reasonably prudent man would, taking into consideration all the circumstances which should affect his conduct. The trial court then cited the following cases: *Averbuch v. Great Northern R. Co.*, 55 Wash. 633, 104 Pac. 1103; *Merwin v. Northern Pac. R. Co.*, 68 Wash. 617, 123 Pac. 1019; *Stewart v. Northern Pac. R. Co.*, 96 Wash. 486, 165 Pac. 377; *Brandt v. Northern Pac. R. Co.*, 105 Wash. 138, 177 Pac. 806, 181 Pac. 682; *Kent v. Walla Walla Valley R. Co.*, 108 Wash. 251, 183 Pac. 87; *Petry v. Hines*, 117 Wash. 175, 200 Pac. 1077.

The opinion continues by stating that, when the truck was forty-five feet from the main line track, the train was one thousand feet north of the crossing; that, when Mr. Byerley was at this point, *he was in a position where he could see the train;* that the jury could have found that the train was traveling approximately sixty miles an hour; that this is a heavily traveled crossing; that the schedule of running time for passenger trains between Selah and Yakima is thirty-five miles per hour; that from this evidence the jury could legitimately find that the train, in approaching the crossing, was being operated at an excessive rate of speed, which was negligence on the part of the company, and that such negligence was a proximate cause of the accident.

At this point may we state, without commenting on what the respective rights may be of one approaching a grade railroad crossing in an automobile on the highway, and a train approaching such crossing, where there is no automatic signal warning such

as there was in this case, we cannot believe that the rights of such user of the highway and the train are equal, when, as in this case, there was a warning signal in operation, complying with the state law, and again may we state we have been cited to no case which so holds. This signal is not a warning that one on the highway must just look and listen, after which he may, under certain circumstances, proceed, but the statute says he shall stop his vehicle and remain standing and not traverse any railroad grade crossing when a human flagman or mechanical or electrical signal gives or continues to give a signal of the approach or passage of any train. We cannot help but conclude that, under the circumstances last above stated, and such as appeared at this crossing at the time of the accident, the train had the absolute right of way over highway traffic, from the time such signal began to operate until the train had passed over the crossing.

Continuing, the memorandum opinion states that the next question for determination is: Was the driver of the truck guilty of contributory negligence as a matter of law? The trial court then quotes from the *Averbuch* case, *supra*, and thereafter, in concluding that it could not be said as a matter of law that the driver was guilty of such negligence, rests its decision upon certain testimony to the effect that, when the driver of the truck was forty-five feet from the crossing, the train was one thousand feet north of the crossing. The court then takes various speeds, from thirty to sixty miles per hour, and estimates the time it would take for the train to reach the crossing, and also estimates the time it would have taken Mr. Byerley, traveling at three miles per hour, and concludes with the statement that the jury had a right to conclude that the driver of the truck could have crossed the main line track in safety had the train been operated at its usual

rate of speed of thirty-five miles per hour. Respondent has generally adopted the theory of the trial court.

We admit that the victim of an accident must be judged by the circumstances surrounding him at the time of the accident, and by the conditions as they appeared to him. While, as we have stated, the trial court did not in its opinion mention the warning signal, it must be assumed that the court considered this along with the other facts, as it must be taken into consideration when passing upon the question of whether or not Mr. Byerley was guilty of contributory negligence.

In none of the cases cited by the court or by respondent was there an automatic signal device in operation. In the *Stewart* case, *supra,* there was a signal device, but it was not operating. In practically all of the cases cited by the court and by respondent, there was testimony either by the driver of the vehicle or someone riding in the vehicle, as to what was done and what was seen, and various reasons were shown why the driver of the vehicle had, before seeing the train, approached so close to the track as to make it impossible to stop and avoid the collision. Also, in several, if not all of the cases, there was a conflict in the evidence as to whether any warning signal was given by the approaching train, either by blowing a whistle or ringing a bell. In these cases, we held that it became a question for the jury to determine, as to whether or not the driver of the vehicle was guilty of contributory negligence.

It is contended by both parties, in their respective briefs, that Byerley was familiar with the crossing, but certainly there is no direct testimony to that effect, and such a conclusion can be reached only by inference from the fact that he had been foreman of the Finley ranch at Selah for two and one-half years, and that I street was the usually traveled route from

the Selah district to produce row in Yakima. There is no testimony that Mr. Byerley had ever been over this crossing, or that he knew anything about the train schedules or the usual speed of trains at the crossing.

In approaching the question of the negligence, if any, of Mr. Byerley, we should keep in mind a rule long followed in this state and in all jurisdictions, to the effect that a railroad crossing is a proclamation of danger, even in the absence of an automatic signal, and that those who propose to enter its zone must govern themselves accordingly. *Morris v. Chicago, M., St. P. & Pac. R. Co.,* 1 Wn. (2d) 587, 97 P. (2d) 119, 100 P. (2d) 19. In connection with this rule, we have stated that a traveler approaching a railroad crossing must look and listen, and that the observation must be made at a point or from a position where it would be effective. *Morris v. Chicago, M., St. P. & Pac. R. Co., supra,* and cases cited therein.

In the instant case, it was stipulated that the truck could have been stopped in ten feet.

While the trial court, in reaching its conclusion, apparently assumed that Mr. Byerley, when he was forty-five feet east of the main line track, could have seen the train one thousand feet to the north, and respondent's main argument is based on this assumption or inference, and while we think this inference is justified from the physical facts, there was some testimony that one coming out from behind the Standard Oil Company building can only see to the north to about the telephone house, which, as we have said, is approximately five hundred feet. If Mr. Byerley saw the train when he came out from behind the Standard Oil Company building, then regardless of the automatic signal, it was his duty to watch the advancing train, and this duty was not performed by looking once and then

going blindly forward into the zone of danger. It was his duty at least to again look before he entered the danger zone, and he had no right to rely implicitly on the presumption that the servants of the railroad company would be operating its train at a lawful speed.

But, assuming that Mr. Byerley did not see the train when he first came out from behind the Standard Oil Company building, the whistle was blowing and was heard by all the witnesses, including Mr. Millius, the wigwag signal was operating and the bell was ringing, so no other conclusion can be reached than that Mr. Byerley must have known a train was approaching, even though he did not at that time see it, and it was his duty to watch out for it. Had he again looked when he was thirty-five feet east of the main line track, we are satisfied, from the physical facts, that he could have seen the train, which at that time must have been much closer than one thousand feet, and when he had reached a point twenty feet from the track or less, at which time he still could have stopped, the train must have been so close to him that to attempt to pass in front of it was flirting with death. In *Woolf v. Washington R. & Nav. Co.,* 37 Wash. 491, 79 Pac. 997, we stated:

"If he discovered the train in time to have stopped and avoided the collision, and did not do so, but attempted to beat the engine across the track, he certainly contributed to the cause of the collision. If he drove along slowly for a considerable distance, where he might at any time have looked and seen the approach of the engine, but neglected to do so until it was too late to avoid the collision, it is likewise certain that he contributed to the cause of the catastrophe."

*Beeman v. Puget Sound Traction Light & Power Co.,* 79 Wash. 137, 139 Pac. 1087, points out one of the distinctions between the cases cited by the trial court and respondent, where the train was not seen or heard

until too late to avoid a collision, and the instant case. We quote from the cited case:

"We do not understand that this or any other court has ever held that one, knowing a street car to be approaching, can shut his eyes to the fact and step heedlessly in front of it under the mental assumption that the car will not overtake him. Accidents are not ordained or prescribed. They happen, and generally it is the unexpected that happens. What might happen is one of the cogent factors in determining questions of relative duty. That the duty of the motorman and the pedestrian is relative has been frequently held by this court. How far a pedestrian, having knowledge that a car is approaching, may go in acting upon the presumption that a car will not be operated at an excessive rate of speed or in defiance of the rights of others, is a question that is not altogether strange to the courts. In a case very much like the one at bar, the court of appeals in the state of Missouri said:

" 'He had the right to indulge in the presumptions that the motorman would not run the car at a negligently high rate of speed; that he would sound the bell as the car neared the crossing and would reduce its speed to avoid a collision, but this did not absolve him from the performance of his duty to *observe the advancing car*. A person approaching a railroad crossing whether in the country or in the city is not permitted to rely entirely on such presumptions, but must make reasonable use of his senses to guard his own safety and the failure to do this is negligence. The duty thus to protect one's own safety continues until the crossing has been traversed. A person in the exercise of reasonable care who is unhindered and whose view is unobstructed cannot take a last look at some distance from the crossing whether it be twenty feet or two thousand feet away and then shut his eyes and go blindly forward relying implicitly on the presumption that the servants of the railroad company will not be negligent in the running of its trains or cars.' Cole v. Metropolitan St. R. Co., 121 Mo. App. 605, 97 S. W. 555." (Italics ours.)

The cited case also quotes from the Wisconsin case

of *Grimm v. Milwaukee Elec. R. & Light Co.*, 138 Wis. 44, 119 N. W. 833:

" 'He is not at liberty to calculate how long it will take an approaching train to reach the crossing if running at a lawful and usual rate of speed. He must anticipate that it may be running at an excessive speed and may reach the crossing before he can safely pass it.' "

The cited case then quotes from *Johnson v. Washington Water Power Co.*, 73 Wash. 616, 132 Pac. 392, as follows:

" 'It is clear that the car was much nearer the appellant, when he entered the street and when he looked the second time, than he estimated it to be; and while he may have concluded that he had plenty of time to cross in front of it, he did not in fact have sufficient time, and did not verify his estimate by taking a look immediately before he entered the place of danger. His injury was clearly, therefore, contributed to by his own negligence. . . . *By stopping at any time before he reached the railway track, the appellant would have been in a place of safety, and for one in his situation, knowing as he must have known had he looked in the direction of the car that it was almost upon him, to stop before attempting to cross the track would have been the exercise of only ordinary prudence and care.*' " (Italics ours.)

The court then referred particularly to the case of *Merwin v. Northern Pac. R. Co.*, 68 Wash. 617, 123 Pac. 1019, cited by the trial court in the instant case, wherein the driver did not see the approaching train, the court stating that the case could be distinguished upon the facts. We then quoted from the case of *Richmond v. Tacoma R. & Power Co.*, 67 Wash. 444, 122 Pac. 351:

" 'Of course, it can be said that he was required to use his senses and exercise such care as a man of ordinary prudence would be expected to exercise under *such circumstances*,' " (Italics ours.)

continuing:

> "What is the meaning of 'such circumstances?' Certainly it does not mean that a man *who knows that a car is approaching* is to be bound by the same rule as one who does not know it, and who, under the facts, *is not necessarily bound to know it.*" (Italics ours.)

Even regardless of the wigwag signal, we are of the opinion that it must 'be held in this case that Mr. Byerley was guilty of contributory negligence as a matter of law, for if it can be inferred that he saw the train when he was forty-five feet to the east, the duty was cast upon him to watch its approach, and had he done this, it must have been evident to him, when he had reached a point twenty to thirty feet from the track, that a collision was imminent if he proceeded to cross, as the train must have been so close at that time that no other conclusion was possible. On the other hand, even if he did not see the train when he was forty-five feet from the track, had he listened he must have heard the whistle of the train and heard its bell ringing, as all the witnesses, some of whom were much farther away than Mr. Byerley, heard the whistle and the bell, and this should have apprised him of the approach of the train. Had he thereafter looked before entering the zone of danger, he must, as we have said, seen and observed that the train, by whistling, was claiming the right of way, and that a collision was almost unavoidable, if he proceeded. Of course, as we have said, it is only by inference that we can reach a conclusion that Mr. Byerley looked, or where he may have looked.

Respondent further contends that, according to the time card, the speed of the train at this point was thirty miles per hour, and that the jury could have found that the operator of the truck knew of this long standing rule and custom of the company to so operate

its trains, and that he had a right to rely upon it. We think that to conclude in this case that the jury had the right to infer that Mr. Byerley had any familiarity with this crossing would be to say that the jury might indulge in an inference not drawn from facts appearing in the record, but certainly no inference could be drawn from any facts herein, that Mr. Byerley was familiar with the train schedule or the speed of trains at this crossing. There was no time card introduced and no testimony as to how long the schedule, testified to by W. A. Dalberg, the engineer, had been in effect, unless it be the testimony of R. K. Hayes, the brakeman, and his testimony certainly does not establish a long standing custom.

The only definite testimony, as to when the train was due to leave Selah and the running time between Selah and Yakima, came from Mr. Dalberg. This witness testified that the regular departure time for the train from Selah was one-forty-two, and that they were not permitted to leave before that time; that on the day of the accident they left Selah at one-forty-two; that the time card distance from Selah to Yakima was 3.8 miles, and that the running time was eight minutes.

The only testimony as to the exact time the accident occurred was that of E. B. Sheehan, the conductor, who testified that it happened at one-forty-eight, and that it was about three miles from Selah to the place of the accident.

We appreciate that both of these men were what might be termed interested witnesses, but respondent must rely on the testimony of Mr. Dalberg to establish any schedule, and while the jury were not bound to accept the testimony of Mr. Sheehan, to disregard it would be to disregard testimony which is not contradicted, and comes from a witness who, in spite of his

interest, would be most likely to know of the facts testified to.

To sustain her contention that Mr. Byerley had a right to rely on a train schedule and long standing custom and rule, respondent cites, among others, the case of *Mattingley v. Oregon-Washington R. & Nav. Co.*, 153 Wash. 514, 280 Pac. 46. In the cited case, a young man, killed at the crossing there in question, had lived about a half mile from the crossing, and had been familiar with it for nine years, having crossed it almost daily. There was evidence that, for years prior to the accident, the defendant company had continuously and habitually reduced the speed of its trains at this point to six miles per hour, and that such custom was well known to the public and to the deceased. There was also a conflict in the evidence as to whether the motor coach gave any signal as it approached the crossing, and also a presumption of due care. The cited case is not controlling herein.

We have examined the cases cited by the trial court, most of which are cited and relied upon by respondent, and have also examined the additional authority cited by respondent, and for reasons hereinbefore assigned, we do not think they are applicable to the instant case. We can refer to only two or three of them, which we believe to be typical cases.

The *Stewart* case, referred to by both the trial court and respondent, involved the same crossing as the instant case. It was what might be termed a horse and buggy case, and considerable stress is laid on this fact, especially as it bears on the place where Stewart should have stopped. In the *Stewart* case, the wigwag signal was not working at the time of the accident. The facts show that Stewart had driven over this crossing many times, was familiar with the signal, and had heeded its warning on other occasions. We there stated:

"These facts, taken together with the fact that he was· driving a horse instead of an inanimate motor driven vehicle, might have induced the jury to believe that, as a reasonably prudent man, he was not negligent in proceeding as he did and without first going forward a sufficient distance to see along the track and stopping and looking."

The *Averbuch* case, also cited by the trial court and respondent, was another horse and buggy case. We there stated:

"When respondent reached a point within two or three feet of the planking, and within six or seven feet of the Northern Pacific track, he stopped the wagon and, before attempting to go over the crossing, looked both north and south along the tracks for any train that might be passing. Previous to this, his view had been obstructed by buildings, sheds, etc. According to his testimony, *not seeing or hearing any engine approaching,* he drove on to the track, passed over the Northern Pacific track, and when his horse's feet were up on the Great Northern track between the rails, the engine rushed on to him and did the damage complained of."

The evidence in the cited case showed that there was sixteen or seventeen feet between the main line track of the Northern Pacific and that of the Great Northern, where the accident happened. There was evidence that from where the plaintiff stopped he could not see down the track more than two hundred fifty to three hundred feet. There was also evidence of a city ordinance. The engine was being backed, and the engineer's view of the crossing was completely shut off, and no bell or whistle was sounded.

Respondent also cites and quotes from the case of *Golay v. Northern Pac. R. Co.*, 105 Wash. 132, 177 Pac. 804, 181 Pac. 700, wherein we stated that, in determining the questions presented, we had to take into consideration two lines of authority. The opinion then

cited the case of *Woolf v. Washington R. & Nav. Co.,*
37 Wash. 491, 79 Pac. 997, as typical of the cases sup-
porting the first rule. In the *Woolf* case it is stated:

"It thus follows that either he did not look, or else
he did look and attempted to make the crossing ahead
of the engine. In either case, he would be clearly
guilty of contributory negligence."

We again refer to the *Golay* case, wherein we stated:

"The second line represents those cases where the
pedestrian or driver of a vehicle has approached the
railroad track and has exercised some degree of care
and caution in attempting to apprise himself of the
approach of a car or train, and in those cases it has
been held that, when he has looked or listened and
has not seen nor heard the car or train approaching,
or when he has looked and has seen the car or train ap-
proaching and has not been able, by reasonable care, to
determine the speed of its approach, he has the right
then to assume that the railroad company will not place
a car or train within striking distance of him by operat-
ing such car or train at an unlawful rate of speed.
There is then presented a question of fact for the jury
to determine whether he has exercised a reasonable
degree of care and caution for the purpose of his self-
protection. This line of decisions is represented by the
following cases: *Averbuch v. Great Northern R. Co.,*
55 Wash. 633, 104 Pac. 1103; *Richmond v. Tacoma R.
& Power Co.,* 67 Wash. 444, 122 Pac. 351; *Merwin v.
Northern Pac. R. Co.,* 68 Wash. 617, 123 Pac. 1019."

Respondent contends that the instant case falls
within this second rule and the cases cited, and under
the other cases cited by the trial court and respondent,
which are to the same effect. We are unable to agree
with this contention of counsel. We readily admit
that the cited cases were properly decided on the facts
as presented in the respective cases, and that situations
may be presented when it cannot be said as a matter
of law that the driver of an automobile is guilty of
contributory negligence in attempting to cross a rail-

road track, when for certain reasons he did not see or hear a train approaching until too late to avoid a collision, or even when it affirmatively appears that after the exercise of reasonable care he failed to properly judge the speed of the train, running at an unlawful rate of speed, but, in our opinion, no case has been cited from this or any other jurisdiction, which would support a conclusion, based upon facts such as were shown to exist in the instant case, both by the testimony and physical facts, that Mr. Byerley was not guilty of contributory negligence as a matter of law.

We have had before us many cases involving accidents at railroad crossings. The facts in no two of them are exactly the same. However, we are satisfied that, under the rules announced in the cases of *Woolf v. Washington R. & Nav. Co., supra; Beeman v. Puget Sound Traction Light & Power Co., supra; DeTemple v. Schafer Bros. Logging Co., supra; Spokane County v. Great Northern R. Co.,* 178 Wash. 389, 35 P. (2d) 1; *Morris v. Chicago, M., St. P. & Pac. R. Co., supra;* (see, also, *Hynek v. Seattle,* 7 Wn. (2d) 386, 111 P. (2d) 247) and many other cases discussed in the cited cases, it must be held as a matter of law that Mr. Byerley was guilty of contributory negligence. When, in addition to the facts in the cited cases, there is, as in the instant case, a signal device operating, that becomes an additional factor to support this position.

Admitting, as contended by respondent, that, this being a dangerous crossing, appellant company was guilty of negligence in operating its train at a speed of from fifty to sixty miles an hour, whether or not there was a city ordinance or state law limiting such speed, still we think the following statement made in *Woolf v. Washington R. & Nav. Co., supra,* is applicable herein:

"Assuming, as we must, that they were negligent, it nevertheless appears conclusively that his negligence contributed proximately to the cause of the unfortunate calamity."

See, also, *Cable v. Spokane & Inland Empire R. Co.,* 50 Wash. 619, 97 Pac. 744, 23 L. R. A. (N. S.) 1224; *Sadler v. Northern Pac. R. Co.,* 118 Wash. 121, 203 Pac. 10.

For the reasons herein assigned, we are of the opinion that the trial court erred in denying appellants' motion for judgment notwithstanding the verdict.

The judgment of the trial court is reversed, with instructions to enter judgment dismissing the action.

ROBINSON, C. J., BEALS, and SIMPSON, JJ., concur.

BLAKE, J., dissents.

[1]Reported in 120 P. (2d) 464.