ERNEST MONFORTON, Plaintiff and Respondent, v. NORTHERN PACIFIC RAILWAY COMPANY, a Corporation, and HENRY MORRIS, Defendants and Appellants.

No. 10048.

Submitted April 1, 1960. Decided August 11, 1960.

Rehearing denied October 10, 1960.

355 P. 2d 501.

192

Coleman, Lamey & Crowley, Billings, Dan R. Lovelace, Bozeman, for appellants.

Bruce R. O'Toole Billings, argued orally for appellants.

H. A. Bolinger, Jr., Douglas R. Drysdale, Bozeman, for respondent.

H. A. Bolinger, Jr. for respondent.

HONORABLE H. B. HOFFMAN, District Judge, sitting in place of MR. JUSTICE BOTTOMLY, delivered the Opinion of the Court.

This is an appeal by defendants from a judgment of the district court of the eighteenth judicial district entered in favor of the plaintiff on a complaint to recover on two causes of action, one for personal injuries, the other for damages to the truck which plaintiff was driving southward on a public highway one mile north of Belgrade, in Gallatin County, where a passenger train proceeding southeasterly crossed the highway and collided with the truck when it started to cross the railway track.

The respondent and his witnesses produced evidence of appellants' failure of the engineer of the diesel engine drawing the train to blow a whistle or ring a bell for the road crossing. The usual "railroad crossing" signs had been erected and were in place. It is conceded that this evidence of negligence on the part of appellants is sufficient to predicate actionable negligence against the appellants. Defendant, Henry Morris, was the engineer.

The physical facts are quite easily illustrated. The collision occurred on Dry Creek Road one mile north of Belgrade. The road runs due north and south, entering Belgrade from the

north. Let the point of collision on the highway be marked A. The railway track crosses the highway, for practical purposes, on a straight line running northwesterly and southeasterly through point A. at an angle of thirty or thirty-six degrees between the railroad and Dry Creek Road. Slightly less than one mile north of A, Dry Creek Road meets another public highway running straight east and west. Let the point of intersection here be marked B. Respondent drove his empty, 1952, 1½ ton G.M.C. truck, equipped with a stock rack, westerly to point B, made a left turn and started south on Dry Creek Road, then graveled, level, and dry all the way. Weather and visibility was clear. Admittedly, he maintained fairly constant speed of twenty-five miles an hour to A, the point of collision.

The highway running east and west intersects and crosses the railway west of B at point C. We then have the enclosed right triangle, the two highways, AB and BC, forming the two legs and the railway, AC, the hypotenuse. The railway rises southeasterly at a grade of one-tenth of one percent. The railway tracks are built at a fairly constant elevation about the abutting land between A and C — at point A, five feet. The field enclosed within the triangle, A B C, is open, with absolutely no obstruction to vision and full view of the railway from any given point on Dry Creek Road between A and B, except only, that one witness suggested, but offered no positive testimony, that there may have been a hay stack somewhere between Dry Creek Road, A to B, and the railway, A to C. The triangle, A B C, is a level plane rising slightly as it approaches A. Nothing obstructs the plain and full view of the railway tracks from any point between A and B. It is to be noted that the railway tracks from A to C were elevated approximately five feet above the land east of such tracks. The passenger train was in plain full view at any point between A and C from any point on AB. Respondent's witness, John S. Milesnick, who has lived four and one-half miles north of Belgrade for twenty-two years, testified the triangle A B C was "a great big wide open field".

Alex H. Cloyd drove a dark DeSoto northward on Dry Creek Road and crossed the railway tracks shortly before the accident. Respondent did not remember passing the Cloyd DeSoto, which he must have passed on Dry Creek Road very near to and north of the railway track. Cloyd testified as follows:

"Q. I presume, Mr. Cloyd, that you were driving on your own right-hand side of the road as you crossed the tracks? A. Yes, sir.

"Q. And I also presume that you were proceeding at a reasonable rate of speed? A. Yes, sir.

"Q. About how fast, if you can remember, were you traveling? A. I can't remember.

"Q. Do you remember whether you were driving fast? A. Oh, probably 40 miles an hour.

"Q. That road there is wide enough for two cars to pass? A. Plenty of room.

"Q. Easy isn't it? A. Yes, sir.

"Q. Did you make plenty of room on the other side for cars to pass you going in the opposite direction? A. I always did.

"Q. Incidentally do you happen to remember whether you may have met any other traffic besides the truck at or near the time of this accident? A. I met one truck going the opposite direction to what I was.

"Q. And I think that's the truck that was involved in this collision, wasn't it? A. I think so, sir.

"Q. Did you look up the track to see if a train was coming before you crossed? A. I looked down the track.

"Q. Did you look left or right? A. How was that?

"Q. Did you look left or right? A. I guess that would be my left.

"Q. And there was a train coming towards the crossing was there not? A. Yes, sir.

"Q. And you looked at it and felt that you had time to get over didn't you? A. Yes, sir.

"Q. And did you make it over in plenty of time to be safely out of the way of that train? A. Yes; well, I thought I was."

Henry Carpenter, with his wife, Iva Evelyn Carpenter, and her mother, followed the respondent from point B to within a short distance from A when the accident occurred. They followed at a distance of two hundred feet. Mr. Carpenter was driving, but did not testify. His wife, respondent's witness, testified as follows:

"Q. And who besides your husband and yourself was in the car? A. My mother, Mrs. Thompson.

"Q. And — all right. You followed Mr. Monforton as he proceeded south? A. Yes.

"Q. And would you know approximately the distance that you were behind his truck as you followed him to the south? A. I would say 200 feet approximately.

"Q. And, now Mrs. Carpenter, did you later become aware there was a train on the track? A. Well, just before we stopped at the crossing we saw it.

"Q. And what kind of a train was it on the track? A. Passenger.

"Q. And did — who in your car first observed the train? A. I believe it was myself.

"Q. Now you say it was just before you stopped at the crossing. Did you stop near the crossing that day? A. Well, I imagine we were about 200 feet from the crossing anyway.

"Q. That your husband stopped the car? A. Yes.

"Q. And you had been traveling south along this Dry Creek road and — A. (Interposing) Yes.

"Q. (Continuing) — and was just about that point when you first observed the passenger train, is that correct? A. Yes.

"Q. How did you happen to stop your car there, if you know? A. Well, we saw the train and then stopped.

"Q. And what did you observe about Mr. Monforton's truck at the time? A. Well, he wasn't driving very fast, and we thought he might stop, but he failed to do so.

"Q. And then did you see his truck get hit? A. We did. * * *

"Q. Did you, in your own car, try to do anything to attract Mr. Monforton's attention to the train? A. No.

"Q. Did you consider attempting to do such? A. Yes, we thought of honking but we was afraid it would attract his attention back instead of forward.

"Q. Could you tell from the rear view mirror, either from Mr. Monforton's rear view mirror or looking through his window, what he was doing as he approached the track? A. No.

"Q. In other words, you didn't know whether he was looking or not? A. No. * * *

"Q. Did you actually discuss with your husband the matter of whether or not you should blow the horn to attract his attention? A. I think I mentioned it but I don't think my husband answered. He said afterwards he was afraid it would attract his attention back.

"Q. About how far do you think Mr. Monforton was, if you can give us an estimate, when you mentioned that to your husband? A. Well, he was very close to the track; I couldn't tell how far.

"Q. Well, is it fair to put it this way then, that you didn't consider that there was any danger until Mr. Monforton was very close to the track? A. True.

"Q. However, you had watched — you had seen the train approaching for some little distance and just felt that Mr. Monforton would naturally see it and stop, is that right? A. Yes.

"Q. And you yourself saw the train? A. Yes.

"Q. Were you driving a sedan? A. Yes. * * *

"Q. Isn't it a fact, Mrs. Carpenter, that you were so

totally absorbed with what you saw going on before you that you pretty much were unmindful of everything else going on except trying to figure whether Mr. Monforton would make it or not? A. To a certain extent.

"Q. You were terribly concerned about it weren't you? A. Sure."

Wallace Cox, who had resided fifteen miles north of Belgrade for forty years, drove into Belgrade just before the accident. As he crossed the railway track he looked down the track and saw the train at a distance between one and two miles away. He testified:

"Q. Now when you are driving an unloaded truck in which you have no visibility do you want this court and jury to believe that you didn't consider it necessary to look up the track to see how far you could see a train — look for a train? A. I always leaned forward and looked as far as my visibility would limit me in a truck.

"Q. In other words, you did take the precaution, Mr. Cox, in all circumstances, didn't you, that I consider any prudent drive should, of leaning forward and peering out your right window to see just as far as you could see, isn't that right? A. That is correct; your vision is limited.

"Q. But you did make a practice of looking up the track by leaning forward when you were in your truck of limited visibility? A. You have got to respect a train. * * *

"A. The angle of the track agoing you might say, southeast, and the road going south, you are almost going along, you can see, your vision is not restricted, you can see that train.

"Q. If it's out to the side of you? A. Yes.

"Q. Now if you could — didn't see a train out to the side of you and you knew you were traveling faster than a train would be traveling on that track would you turn and lean clear forward and look back down the track? * * * A. Yes."

198

Later he testified as to crossing the tracks: "I always look down the track before I came to the crossing; I didn't check it as close empty."

Respondent testified that he reached B ahead of Carpenter, turned south and Carpenter followed him about two hundred feet behind. At point B he looked; the whole track was in front of him, "that is, across that triangle there." He did not see a train. He further testified:

"Q. Now as you proceeded south were you watching the road ahead of you? A. I was.

"Q. What effort did you make to look for trains? A. I glanced over occasionally to the right.

"Q. When was the last time you glanced over to the right? If you remember. A. Well, I can't say exactly it was well up the road.

"Q. When you say 'well up the road' do you mean near the crossing or near the corner? A. Oh, nearer the crossing; I wouldn't be able to say just when it was.

"Q. When you looked to the right you didn't change your body position in the cab of the truck any, that is, you simply turned your head and looked to the right? A. Yes. No, I didn't move over in the seat.

"Q. You didn't lean forward either to get a little better view? A. Couldn't lean very much forward with the steering wheel in the truck in front of me.

"Q. When you were proceeding along that road you knew that the crossing came in, or the track came in at an angle or a similar angle to that shown on this plat, did you not? A. Yes, I did.

"Q. Was the window of the truck rolled up or down do you remember? A. No, they were closed.

"Q. Did you at any time stop before you reached the crossing for the purpose of looking for a train? A. I can't remember stopping.

"Q. You do have a recollection of your proceeding along

the road, I think you said, up until you were within a hundred feet? A. Something like that, yes.

"Q. Was there any traffic on the road besides the Carpenter car that you remember? A. I can't remember anyone else.

"Q. There was presumably a red car that passed over the crossing going in the opposite direction shortly before the accident you have been told that since, haven't you? A. I have been told there was a car there, yes.

"Q. You have no recollection of that car there? A. Not at all."

The crux of this case is whether plaintiff was guilty of contributory negligence, which was interposed as a defense. It is the opinion of the court that the whole record resolves the issue in favor of the appellants; that the record discloses that the respondent failed to exercise that degree of care which an ordinary, reasonable and prudent man, under the circumstances of this case, would have exercised for his own safety, and that his lack of due care was a direct and proximate cause of his injury and damage. He neither duly looked, listened, nor took any precaution for his own safety. Had he used his senses, he could not have failed to see the approaching train. There was no obstruction whatever to interfere with respondent's observation or power of observation. The same may be said concerning his hearing. There is evidence that this line of railway track was used almost exclusively for freight trains. The train involved in this accident was a passenger train approximately one thousand feet in length drawn by a three-unit diesel engine. While there is evidence that this train moved more quietly than the freight trains that usually passed over this line, there is no evidence that the passenger train would not have been heard in time for safety, had the plaintiff given attentive ears when he approached the railroad crossing where the usual "Railroad crossing" signs had been erected and were in place. The grade leading up to the railroad to cross it was between one hundred

and one hundred and twenty-five feet long, which with the railroad itself in plain view for nearly a mile, were sufficient warnings to bring the sense of hearing of a reasonably prudent man into play.

The respondent testified that his brakes were very good, that the windows were clear that he was not traveling faster than twenty-five miles per hour. Sergeant William C. Benson qualified as an expert witness and testified that the actual braking distance of plaintiff's truck, going twenty-five miles per hour on that highway would be forty feet; the approximate stopping distance would have been not to exceed ninety-two feet. Respondent thought the truck could have been stopped somewhere between sixty and one hundred feet. Considering the one hundred to one hundred twenty-five feet grade from the road level up to the track where the collision occurred the actual stopping distance was quite certainly less than that.

Section 72-164, R.C.M. 1947, among other things provides: "* * * provided, however, all persons driving motor vehicles * * * where the view is obscure, or when a moving train is within sight or hearing, shall bring said vehicle to a full stop not less than ten nor more than one hundred feet from where said highway intersects railroad tracks".

Hunter v. Montana Central Ry., 1899, 22 Mont. 525, 57 P. 140, lays down principles of law, ever since followed in Montana, which are impelling in our decision. We followed that decision twenty-five years later in West v. Davis, 71 Mont. 31, 227 P. 41, 45, wherein we observed that the decisions of this court are wholly adequate upon which to base our opinions on the precise issue of contributory negligence. After reviewing prior decisions, this court said: "It is apparent, no matter what the plaintiff himself testified, that the train, at the time when the plaintiff was in place of perfect safety, was at a point where the plaintiff could not have failed to observe and hear it if he had looked or listened. We cannot subscribe to the proposition, because a man testifies that he did look and did not see an

object which manifestly must have been at a certain point at a given time within his plain view, where he admits that his sight is good and nothing to interfere with his vision, that thereby any question is presented for the jury when the ordinary use of his senses must necessarily have given him warning of the approach of the on-coming train. These facts, in our opinion, were demonstrated beyond any question upon the trial of this case by the testimony offered by the respondent himself and his witnesses; and we think, for the reasons above stated, and in view of the previous decisions of this court, that the trial court erred in refusing to grant the nonsuit requested by the defendant at the close of plaintiff's case, and also erred in refusing to direct a verdict for defendant, inasmuch as the defendant's case in nowise aided the case of the plaintiff.''

The foregoing pronouncement of our law is solidly buttressed upon the following decisions that had then been rendered: Hunter v. Montana Central Ry., 22 Mont. 525, 57 P. 140; Meehan v. Great Northern Ry., 43 Mont. 72, 114 P. 781; George v. Northern Pacific Ry., 59 Mont. 162, 196 P. 869; Normandin v. Payne, 65 Mont. 543, 212 P. 285; Keith v. Great Northern Ry., 60 Mont. 505, 199 P. 718; and Roberts v. Chicago, M. & St. P. Ry., 67 Mont. 472, 216 P. 332. Our recent decisions are fully in accord: (Rau v. Northern Pacific Ry., 87 Mont. 521, 289 P. 580; Grant v. Chicago, M. & St. P. Ry., 78 Mont. 97, 252 P. 382; Sullivan v. Northern Pacific Ry., 109 Mont. 93, 94 P.2d 651; Incret v. Chicago, M. & St. P. & P. Ry., 107 Mont. 394, 87 P.2d 12; Great Northern Ry. Co. v. Taulbee, 9 Cir., 1937, 92 F.2d 20, certiorari denied 302 U.S. 766, 58 S.Ct. 476, 82 L.Ed. 595.

The respondent emphasized that the Low Line railway tracks upon which the collision occurred was usually used for slow moving freight trains whereas the train involved in this accident was a fast moving passenger train which introduced the element of surprise, or unexpectedness. William W. Walters, assistant superintendent of the Rocky Mountain Division, testi-

fied from the railroad records that between November 4, 1946, and March 23, 1956, sixteen passenger trains went over this Low Line Crossing. Respondent's witness, Iva E. Carpenter, whose qualifications are doubtful, testified the train was going forty to forty-five miles per hour. John S. Milesnick testified for respondent that the speed of freight trains over the Low Line was fifteen to twenty miles per hour. The train dispatcher's records showed that the average speed of the freight trains on the Low Line March 23, 1956, the day of the accident, was thirty and one-half miles per hour; on March 22, 1956, the average was fractionally over that. All freight trains had diesel engines beginning in 1956. The record does not disclose whether witness Milesnick's testimony had reference to diesel drawn freight or coal burning engines. Mr. Walters also produced the tape from the speedometer on the engine which drew the train involved and testified that it showed a speed of forty to forty-four miles in the mile and one-half immediately before the collision, and a speed of forty miles when the brakes were applied. He testified that there was very little difference between the speed of freight and passenger trains on the Low Line. Henry Morris, the engineer of the diesel engine when the accident occurred, said he was traveling thirty-five to forty miles per hour as he came to the crossing.

Respondent, who did not see the passenger train before the accident, asserts that it was the excessive speed of the train over the usual freight trains that caused the accident, but could not, of course, testify as to the speed of the train. His own speed between the points A and B, nearly a mile, was twenty-five miles per hour from which it would appear that even the usual freight train could have overtaken him. He also relies upon faint evidence that the passenger train ran more quietly than freight trains raising an inference that had it been the usual freight train the noise would have warned him. Respondent thereby attempts to substitute an alleged custom on appellants' part for the exercise of due care on respondent's part

at a place of known danger. The better rule, stated in Di Giendemonica v. Pennsylvania-Reading Seashore Lines, 123 N.J.L. 296, 8 A.2d 342, 343, is that a railroad crossing is, as a matter of law, a place of known danger and respondent was bound by law to recognize it as such. The Supreme Court of New Jersey said:

"Stated succinctly, plaintiff's contention is, that where defendant Railroad Company has, through long practice, known to the members of the general public, of whom plaintiff's intestate was one, led users of its crossing to anticipate the operation of defendant's trains at a speed, at that point, not in excess of a certain rate per hour, the increase in that speed or rate of operation of defendant's trains over said crossing, without notice to the public of the change in speed, or adoption of safety precautions by defendant company, constitutes a situation from which negligence may be inferred.   *   *   *

"As the learned trial court said in striking the complaint: 'If a railroad company can be charged with negligence because it caused a train to be operated faster than the usual or customary speed, why can't it by the same token be charged with negligence because a train passes a particular crossing or street earlier or later than it was customary for the train to go by; and why could it not be charged with negligence for increasing train service if the accident happened before it became the custom for the railroad company to operate the additional train or trains? If such were the law, railroads would be liable in damages for a violation of a custom rather than a violation of a duty imposed by statute or other lawful authority.'

"What the plaintiff is really trying to do is to substitute an alleged custom on the defendant's part for the exercise of due care at a place of known danger on the part of the plaintiff's intestate. Custom or no custom, a railroad crossing as a matter of law is a place of known danger and

plaintiff's intestate was bound by law to recognize it as such."

The following cases, not all precisely in point, are in accord: Larrabee v. Western Pac. Ry., 173 Cal. 743, 161 P. 750; Kinghorn v. Pennsylvania Ry., 2 Cir., 1931, 47 F.2d 588; Holt v. Illinois Cent. Ry., 318 Ill.App. 436, 48 N.E.2d 446; Baltimore & Ohio Ry. Co. v. State ex rel. Black, 107 Md. 642, 69 A. 439, 72 A. 340; Byerley v. Northern Pacific Ry., 11 Wash.2d 604, 120 P.2d 453; Nuttall v. Denver & R. G. W. R., 98 Utah 383, 99 P.2d 15; Sohl v. Chicago, R. I. & P. Ry., 183 Iowa 616, 167 N.W. 529.

■ The court, over appellants' objection, gave Instruction No. 13, which was as follows:

"You are instructed that if you find from the evidence that the Northern Pacific Railway Company used the railroad track involved in this action so exclusively for freight trains travelling upgrade at a slow rate of speed as to cause such use of said track to become an established custom and practice of the defendant; and that at the time of the collision involved in this action, plaintiff knew this custom and relied thereon during the time that he approached and crossed said crossing; and if you further find that, at the time of the collision involved in this action the defendant railway company, contrary to such established use and custom, caused a fast-moving passenger train to be run upon and across said crossing which struck the motor vehicle driven by the plaintiff; then, in that event, you may consider these facts, together with the other evidence introduced in this case, in determining whether the plaintiff and the defendants used the care required of them, as such care is defined in these instructions, at said crossing at the time of the collision." Not only is this instruction error, but it is not in consonance with court's Instruction No. 24, which was:

"The plaintiff, while driving his truck toward the crossing, was not entitled to assume that the defendants would operate their trains at any particular time or speed."

Appellants' objection to court's Instruction No. 13 was that respondent had no right to make any assumption of any speed whatsoever. On the particular facts of this case that objection was good.

Respondent labored to exculpate himself from blame for his failure to exercise due care on two grounds, considered separately above—the first—that neither bells rang nor whistle blew for this crossing. The second—that customarily appellants had used this Low Line for slow-moving freight trains whereas on the day of the accident respondent was caught by surprise by a fast-moving passenger train. Appellants concede that the evidence as to the first violation of duty, failure to whistle or to ring the bell, is sufficient to warrant the jury in finding appellants negligent. On the second, appellants concede nothing. We find authorities overwhelmingly against respondent on the first, and against respondent on the second. But, somehow not quite clear, respondent argued that the two together brought his case within the following authorities, which he cited: Hendrickson v. Union Pac. Ry., 17 Wash.2d 548, 136 P.2d 438, 161 A.L.R. 96; Broberg v. Northern Pacific Ry., 120 Mont. 280, 182 P.2d 851; Dimich v. Northern Pacific Ry., 136 Mont. 485, 348 P.2d 786; Farrell v. Erie Ry., 2 Cir., 1905, 138 F. 28; Morris v. Boston & M. R. R., 85 N.H. 265, 160 A. 52; Cox's Adm'r v. Cincinnati, N. O. & T. P. Ry., 238 Ky. 312, 37 S.W.2d 859; Bradley v. Ohio River & C. Ry., 126 N.C. 735, 36 S.E. 181; Ohrmann v. Chicago & N. W. Ry., 223 Minn. 580, 27 N.W.2d 806; Wolf v. New York, C. & St. L. R. R., 347 Mo. 622, 148 S.W.2d 1032; Los Angeles & S. L. R. R. v. Umbaugh, 61 Nev. 214, 123 P.2d 224; Case v. Northern Pacific Terminal, 176 Or. 643, 160 P.2d 313; Missouri-Kansas-Texas Ry. Co. v. Wardlow, 10 Cir., 1959, 262 F.2d 681. These cases are not in point nor can any of them be said to be fairly analogous. Each case involves a standing train on a crossing, dark or foggy night, obscure crossing, extra-hazardous crossing, failure to ring bell or blow whistle, excessive speed (some-

times going through a city), or some automobile passenger who could hardly be held answerable for negligence. Most of the cases do not involve contributory negligence as an issue. In the Broberg case, supra, plaintiff was a passenger in a car driven by Mrs. McFarren who ran into a standing gondola, dark in color, on a cloudy and very dark night. The issue was the negligence of the defendant. In the Umbaugh case, supra, the mother of an adopted daughter killed on a railroad crossing in a car driven by her adopting father brought the suit.

Missouri-Kansas-Texas Ry. v. Wardlow, supra, is probably respondent's most favorable case. There was evidence that a passenger train, using a track usually used by freight trains only, entered the crossing where the accident occurred on Main Street in Sand Springs, Oklahoma, at a speed between forty-eight and seventy miles per hour when the city ordinance limited the speed of trains within fifteen miles per hour. Plaintiff approached the crossing going twenty miles per hour, did not expect a train, and "At a distance of 55 to 60 feet north of the tracks, plaintiff looked to the right and did not see or hear the on-coming train. At this point the track to the west could be seen for about 125 feet. He then looked to the east, and when he turned his attention back to the street, 'the train came roaring through' and he was unable to prevent the collision." He ran into the diesel engine. The court affirmed judgment on the verdict for plaintiff, holding that defendant's negligence and plaintiff's contributory negligence were for the jury.

Careful analysis, of the cases cited, does not disclose reason or authority to disturb our decision. Further examination of them could only unduly lengthen this opinion.

In fairness to respondent, we have carefully examined his contention that the fact that Alex H. Cloyd, going north, crossed the track and passed respondent, of necessity, not far north of the railroad track, should exculpate plaintiff in that his attention was thereby diverted. He leans heavily upon

Walters v. Chicago, Milwaukee & Puget Sound Ry., 47 Mont. 501, 133 P. 357, 358, 46 L.R.A.,N.S., 702, where plaintiff attempted to drive his automobile over a railway crossing situated in a cut eight to twelve feet deep and was hit by a train running from forty-five to fifty-five miles an hour. Vision was restricted. The testimony tended to show that plaintiff had both looked and listened. He did not stop. The accident happened July 1910. The case was decided June 1913. Section 72-164 of our Revised Code was enacted 1919. The court refused to follow the rule to "stop, look, and listen". In the instant case, respondent did not even see the Cloyd car—he so testified. Our case is further distinguishable in the physical environment surrounding the point where the accident happened. Walters did look and listen. He did not discover the train's approach. He did not try to use, as an excuse, that his attention was diverted by the Canty car as the respondent does, in the instant case, argue and insist that his attention was diverted by the Cloyd car that he testified he did not see.

Respondent also cites Walsh v. Butte, Anaconda, etc., Ry., 109 Mont. 456, 97 P.2d 325, where the administratrix sued for death of an automobile driver who drove into a moving train in the nighttime when the view was obstructed by buildings and structures and the night was dark and foggy, the train was painted black, and the crossing gates were up, inviting the deceased to proceed. The cases relied upon by respondent are neither authoritative, persuasive, nor applicable in this case.

Respondent argues that he is entitled to go to the jury on the presumption that a person exercises ordinary care for his own safety. This principle is codified in section 93-1301-7, subd. 4, R.C.M., which reads:

"All other presumptions are satisfactory, if uncontradicted. They are denominated disputable presumptions, and may be controverted by other evidence. The following are of that kind: * * *

"4. That a person takes ordinary care of his own concerns."

To sustain his position, respondent cites Baltimore & Potomac R. R. Co. v. Landrigan, 191 U.S. 461, 24 S.Ct. 137, 48 L.Ed. 262; Choctaw, O. & G. Rd. Co. v. Baskins, 78 Ark. 355, 93 S.W. 757; and Fulton v. Chouteau County Farmers' Co., 98 Mont. 48, 37 P.2d 1025. In the first two cases, there was an absence of evidence whether the plaintiff (or plaintiff's deceased) stopped, looked and listened in the Landigran case or looked in the Baskins case, before attempting to go over the tracks at railway crossings. In both cases, the presumption of due care on the part of the injured persons rested upon a complete lack of any evidence to the contrary.

In the Fulton case, supra, language in Brown v. Cent. Pac. Ry., 2 Cal.Unrep. 730, 12 P. 512, is construed in a manner that might give little comfort to respondent. But the rule of law is stated in the Fulton case, supra, 98 Mont. at page 68, 37 P.2d at page 1031, as follows:

"Contributory negligence is a question of law only when the evidence is of such a character that it will support no other legitimate inference, and even where the facts are undisupted, if reasonable minds might draw different conclusions upon the question and from the evidence, the question is one for the jury."

In Meehan v. Great Northern Ry., 43 Mont. 72, 114 P. 781, 783, this court said, quoting Harrington v. Butte, etc., Ry., 37 Mont. 169, 95 P. 8, 16 L.R.A.,N.S., 395: " 'When the plaintiff's own case presents evidence which, if unexplained, would make out prima facie contributory negligence on his part, there must be further evidence exculpating him, or he cannot recover.' "

This rule has been often applied. Roberts v. Chicago, M. & St. P. Ry., 67 Mont. 472, 216 P. 332; Rau v. Northern Pac. Ry., 87 Mont. 521, 289 P. 580; Holland v. Pence Automobile Co., 72 Mont. 500, 234 P. 284; and many other cases. In the

Roberts case, this court adopted the following language, in 67 Mont. at page 478, 216 P. at page 334: "Plaintiff insists that under the rules as stated, since the testimony of decedent cannot be obtained, he was entitled to have the case go to the jury for the reason that 'there was no positive evidence tending to establish or prove that the deceased was not exercising ordinary care and prudence at the time of the collision,' and cites subdivision 4, section 10606, Revised Codes of 1921 [now R.C.M.1947, § 93-1301-7], which provides that there is a disputable presumption 'that a person takes ordinary care of his own concerns.' In addition to this section, we are cited a number of authorities which deal with the question. Among these is 17 C.J. 1304. The rule there announced bears out the statement of counsel, but there is added the qualification that 'this presumption does not apply where the surrounding facts and circumstances show to the contrary.' "

20 Am.Jur., Evidence, § 158, p. 163, correctly sums up the matter as follows: "Where facts appear, presumptions recede. Thus, the necessity for resorting to presumptions disappears where there is direct and positive evidence upon the matter in issue."

The motion for a directed verdict should have been granted and judgment entered for appellants. We need not decide all issues raised. It would unnecessarily extend this decision, and could in no way alter our judgment.

The dissenting opinion ignores the law in Montana that the driver of a motor vehicle must look not only straight ahead, but laterally ahead. He is presumed to see that which he could see by looking. He will not be permitted to say that he did not see what he must have seen had he looked. The duty to keep a lookout includes the duty to see that which is in plain sight. Monforton is, in legal effect, in the position of having actually seen the passenger train, in the words of Boepple v. Mohalt, 101 Mont. 417, 54 P.2d 857. Autio v. Miller, 92 Mont. 150, 11 P.2d 1039; Johnson v. Herring, 89

Mont. 420, 300 P. 535; McNair v. Berger, 92 Mont. 441, 15 P.2d 834; Grant v. Chicago, etc., Ry., 78 Mont. 97, 252 P. 382; Webster v. Mountain States Tel. & Tel. Co., 108 Mont. 188, 89 P.2d 602; accord.

Monforton would have us believe that his view was obscure, that the steering wheel in his cab was an obstruction to a clear view out of the right cab window, in that it restricted his bodily movement whereby he could not get a clear view out across the wide open field that offered no obstruction whatever. Thereby Monforton is thrown cross-wise with section 72-164, R.C.M. 1947, wherein the State Legislature, in 1919, enacted this statute, ever since in force, that all persons driving motor vehicles where the view is obscure, or when a moving train is within sight or hearing, shall bring the vehicle to a full stop not less than ten nor more than one hundred feet from where the highway intersects the track. Neither Walters v. Chicago, Milwaukee & Puget Sound Ry., 47 Mont. 501, 133 P. 357, 46 L.R.A.,N.S., 702, supra, decided before the statute was enacted nor any decision by this court since the enactment can change or obliterate it.

In Broberg v. Northern Pac. Ry., 120 Mont. 280, 182 P.2d 851, 860, this court defined "obscure" as used in section 72-164, R.C.M.1947, as "not clear, full or distinct", or "when it was not clear and distinct". Obviously, as Monforton proceeded southward, and approached the crossing, this train was, or it was not, in clear, full or distinct view. Justice Adair states that Monforton's view was not obscure nor was the moving train within the sight of Monforton. Iva Carpenter following Monforton a few hundred feet behind him saw the train approaching for some little distance, and "just felt that Mr. Monforton would naturally see it and stop". Wallace Cox preceded Monforton going southward into Belgrade just before the accident in an unloaded truck, looked down the track and saw the train one or two miles away. He "always looked down the track before he came to the crossing". It is not de-

ductible from the evidence either that Monforton's view was not clear and distinct or that the moving train was not within Monforton's sight.

This action sounds in ordinary negligence of appellants, hereinabove admitted. The defense is contributory negligence, the law upon which has been written by this court in black and white.

The record presents no evidence whatever that appellee's attention was distracted by the Cloyd car or that Monforton, because of any distraction, failed to make the necessary look-out for the train. To find otherwise involves an assumption or inference based upon speculation or conjecture that the Cloyd car did distract his attention and the second assumption or inference based on the first, that this distraction was the cause of the failure of Monforton to discover the train's approach. But under section 93-1301-1 to 4, and Fisher v. Butte Electric Ry., 72 Mont. 594, 235 P. 330, one inference cannot be drawn from any other inference or presumption.

Justice Smith wrote an opinion concurred in by two other justices in Sun Oil Co. v. Seamon, 349 Mich. 387, 84 N.W.2d 840. Chief Justice Dethmers wrote a dissenting opinion in the case, concurred in by two other justices. Justice Kelly wrote a separate opinion, agreeing with the trial court's opinion and that the judgment should be affirmed upon the ground that the statutory clear distance rule in Michigan is subject to an exception when an emergency situation was created by defendant. In his separate opinion, Justice Kelly concurred with Justice Smith's opinion on this point only. Justice Smith, quoted by Justice Adair in his dissent, did not muster a majority upon the other grounds he asserted to support his opinion that defendant's conduct amounted to willful and wanton misconduct and under the statutory clear distance rule, contributory negligence was not a defense.

The clear distance rule has no application to the instant case. There is no plea of willful or wanton misconduct on appellants'

part, therefore no question of barring the plea on that ground as was done in Sun Oil Co. v. Seamon, supra.

In conclusion, the dissent seems to us to ignore the trial court's instruction No. 24, that appellee was not entitled to assume that appellants would operate their trains at any particular time or speed.

The judgment appealed from is reversed, with directions to enter judgment for appellants.

MR. CHIEF JUSTICE HARRISON, MR. JUSTICE CASTLES and THE HONORABLE W. M. BLACK, District Judge, sitting in place of MR. JUSTICE ANGSTMAN, concur.

MR. JUSTICE ADAIR dissenting:

I dissent.

Ernest Monforton, without warning, while driving a pick-up truck, was run down and seriously injured by a Northern Pacific passenger train at a railroad crossing on a country road near Belgrade, Montana. This is a suit to recover damages for the injuries and loss so occasioned.

In its answer, the defendant Railway Company pleaded contributory negligence on the part of the plaintiff Monforton. At trial, the district judge, presumed to be a reasonable man, held that the question of the alleged contributory negligence of the plaintiff Monforton, if any, was properly a question for the determination of the jury.

The jury, presumed to be composed of reasonable persons, *unanimously* found and determined that the plaintiff Monforton was *not* guilty of any contributory negligence and that the defendant Railway Company is liable for injuries and loss suffered by Monforton and assessed his damages at the sum of $53,650. From the judgment given and entered, in conformity with the jury's verdict, the defendant Railway has appealed to this court.

The majority opinion herein fails and omits to set forth all the essential facts as presented to the jury at the trial, hence,

it becomes necessary to here set forth certain material facts that have been overlooked by and omitted from the majority opinion.

*The Facts.* The railroad tracks and the country road intersect at the crossing, forming a measured 36 degree angle between the railroad tracks and the country road. As the train and the truck approached the crossing, the passenger train was traveling at the speed of 46 miles per hour, and the truck driven by the plaintiff Monforton was traveling at the speed of 25 miles per hour. Simply stated, the passenger train was moving approximately twice as fast as the truck. Both train and truck were traveling in the same general direction. The truck had a stock rack on the back. In operating his truck, Monforton could see to his left, to his front, to his rear by use of a rear view mirror, and also to his right at an approximate 90 degree angle from the country road along which the truck was proceeding. However, the plaintiff Monforton had a blind spot at the right rear of his truck.

Competent, credible and uncontroverted evidence, *which in determining defendant's motions for nonsuit and for a directed verdict, must be viewed in the light most favorable to the plaintiff,* was introduced which was to the effect that Monforton looked and listened as he approached the crossing where the country road crossed the railroad tracks.

The statement in the majority opinion to the effect that the plaintiff did not look is contrary to the evidence submitted by the plaintiff Monforton, who testified, that up to a point within one hundred feet of the crossing, he was keeping a lookout in all directions, and that he looked to his right through the window in the right-hand door of his truck. Here the testimony, given in person by the plaintiff, is interrupted and ends for a reason not mentioned in the majority opinion but which is most relevant, namely, that the terrific shock accompanying the collision of the train and the truck completely blotted out from plaintiff Monforton's memory all events which occurred after he reached the above-mentioned point about one hundred feet

from the crossing. The evidence is that Monforton's memory was so affected by the impact that he could not recall or remember passing an automobile, which the evidence shows was proceeding along the country road in the opposite direction from that in which plaintiff was traveling, and which automobile safely crossed the railroad tracks but seconds before Monforton's truck reached the crossing and which automobile of necessity had to pass, the Monforton truck, immediately prior to the collision.

The driver of another automobile that was following plaintiff's truck observed the latter meet and pass the above-mentioned automobile that was proceeding in the opposite direction from that traveled by plaintiff's truck. Monforton had no recollection or memory of meeting or passing such automobile, which event would surely have attracted his attention.

Monforton's testimony to the effect that as he proceeded down the country road he was looking and observing in all directions stands uncontroverted and *must* be accepted as evidence of the fact that he kept a proper lookout.

The plaintiff further testified that he did not hear any noise or sounds made by the moving train and such testimony stands uncontradicted in the record. There was no evidence whatever that even tends to show that such moving passenger train, by merely proceeding along the tracks, made sufficient noise or racket to attract the attention of or to be heard by the occupants of the other two automobiles.

The fact that plaintiff did not hear the operating noise of the moving train directs attention to another important element of this case which has been completely ignored by the majority opinion herein, namely, that in approaching this established crossing the moving train wholly failed to ring a bell, blow a whistle or give or sound any warning signal at all, and that the train entered the crossing at a speed of 46 miles per hour, and that the front end of the engine struck the right rear end of the truck at a time when the truck was almost completely across the railway tracks and crossing. The evidence is clear that the

plaintiff Monforton did not run into the train, but that the front end of the defendant Railway Company's engine ran into the rear end of plaintiff's truck. In other words, plaintiff's truck was struck from behind by defendant's train. The train ran into the truck and the train was still behind Monforton's truck when the collision occurred.

The majority opinion places considerable emphasis upon the fact that the field, situate between the railroad tracks and the country road was flat and open and thus completely visible. This situation obtains only while the driver of a vehicle is in a place on the road where he is facing the field prior to approaching the railroad crossing. While proceeding along the country road the driver of a vehicle must be constantly leaving a portion of the wide open field behind him. Monforton in driving his truck toward the crossing was able to look straight ahead and to his left and to his right, but he was wholly unable to look or observe to his right rear from which direction the train approached and bore down upon him. When plaintiff looked to his right he did not and could not see the train because of the simple physical fact that at the time *the train was not there to be seen.*

From the plat presented in evidence, and the other physical facts the following can be demonstrated:

Fifteen seconds prior to the collision, when the train was then 1012.5 feet from the crossing, which point was approximately the *first* point at which the plaintiff's moving truck was observed from the approaching train across *this wide open, flat field,* plaintiff's truck was then 551.25 feet from the intersection. Ninety degree vision to the right from plaintiff's truck at the point 551.25 feet from the crossing would intersect the railroad tracks at a point 687.5 feet from the crossing. The plaintiff Monforton could see and keep under observation only the 687.5 feet from that point to the crossing. At such time the approaching train was then 1012.5 feet from the crossing, being some 325 feet to Monforton's rear, where such train could not

be seen by plaintiff. It is not negligence to fail to see and observe that which is not visible.

When plaintiff's truck reached a point 100 feet from the intersection the approaching train then had 185 feet of track to traverse before reaching the crossing. Ninety degree vision to the right from Monforton's truck would intersect the tracks 123 feet from the crossing. The train at such time was not within Monforton's range of vision. One second away from the point of the crash, Monforton's truck was 36.75 feet from crossing. The train was then 67.5 feet from the crossing and bearing down upon him at a speed of 46 miles per hour. With but 90 degree vision to his right, the oncoming train was not visible to Monforton. As Monforton was proceeding through the crossing he was hit from behind by the engine which at the moment of impact was at his right rear and *behind* his truck.

In examining the relative position of plaintiff's truck and defendant's train as they approached the crossing, it is interesting to note how rapidly the train was gaining upon the truck. The omission from the majority opinion of these most important facts of plaintiff's case is demonstrated by the discussion therein of the speed of the passenger train which would lead one to believe that there was some doubt as to the precise speed of the train. The matter of speed was not and cannot be in dispute. The evidence clearly shows that the train was equipped with a speedometer, with a tape attached, which accurately recorded the actual speed traveled. Following the accident, the tape was detached and removed from the engine and later such tape was introduced in evidence. The portion of the tape which showed the actual speed of the train at the time of the impact was before the jury, and it is now before the supreme court on this appeal.

Contrary to what is said in the majority opinion, the brakes on the train were not applied at any time prior to the actual impact, and collision. The engineer was stationed and sat on the right side of the cab of the engine at which point it was

impossible for him to see the Monforton truck. The fireman occupied a seat at the left side of the cab, where he had a clear view of the Monforton truck traveling along the country road to the fireman's left. The engineer operating the defendant's passenger train testified as follows:

"A. Well that's when I noticed the truck going up in the air in front of the diesel, that's the first thing I realized of the accident. * * * There was nothing said at all until I seen — first thing there was when I seen the truck going in the air.

"Q. Then what did you do? A. I applied the brakes."

The speed of the train with brakes applied is not relevant because the brakes were not applied until after the engine had struck the truck.

The speedometer tape introduced in evidence shows the miles per hour at which the train was traveling. This tape clearly shows that the train was going between 40 and 50 miles per hour. The measured distance between the 40 miles per hour and the 50 miles per hour indicated on the tape is 6/16 of one inch. The halfway point on the tape, being the 45 miles per hour reading, would be 3/16 of an inch above the 40 miles per hour line on the tape. Yet the line on the tape indicating the train's speed at the time of the collision *is a measured 4/16 of an inch above the 40 mile per hour line on the tape.* Thus the train was traveling in excess of 45 miles per hour, but not quite 47 miles per hour. The undisputed physical evidence clearly shows the train was going at least 46 miles per hour when it crashed into the rear end of plaintiff's truck.

The actual physical evidence was the best evidence and it removed all doubt as to the train's speed.

Again, and contrary to what is said in the majority opinion, the plaintiff did not base the claimed negligence of the defendant Railway Company upon the speed of the passenger train per se. The importance of the train's actual speed is either overlooked in the majority opinion or the author thereof fails

to grasp the point of plaintiff's contention. Conceding that, as the majority opinion states "a railroad crossing as a matter of law is a place of known danger", such quoted statement does not cover the entire problem before the court.

The record before this court clearly shows that it was a physical fact that defendant's train was not in Monforton's view as he approached the railroad crossing. There is no evidence whatever in the record before us that indicates that Monforton was disregarding the potential danger attendant upon crossing the tracks; that plaintiff recognized care should be exercised in approaching the crossing is clearly shown by the fact that plaintiff testified, without contradiction, that from the time he headed his truck toward the crossing and continuing thereafter up to a point one hundred feet distant from there, and for as long prior thereto as he could remember he repeatedly looked along the railroad tracks. As to what transpired from and after reaching the point 100 feet from the crossing, Monforton could not testify because the shock of the collision blotted out his memory of those events. The testimony stands uncontradicted that Monforton did not see the train and the physical facts show that the train was not visible to plaintiff. Thus was plaintiff a person proceeding toward a railroad crossing, who, recognized it as a place of danger, and who kept a lookout to all sides, as was his duty, and who testified that notwithstanding these precautions he did not see the train. The physical fact was that when Monforton looked directly to his right the train could not be seen. This is obvious also because of the fact that *if the train had been visible to the plaintiff at any time that Monforton looked, then because of the disparity of speed between the train and Monforton's truck, the train would have reached the crossing first and the collision would not have occurred.*

It was shown that the freight trains which customarily used these tracks traveled thereon at an average speed of about 31 miles per hour. Therefore, if a person approaching this intersection were to see the average train directly opposite him on

the track he would know the train would have to travel farther to reach the intersection than a vehicle on the road, and that the train would catch or hit such moving vehicle only if it were traveling at a greater speed than such moving vehicle.

The testimony shows that it was only on extremely rare occasions that passenger trains were ever run on these particular tracks here involved. When a train is not visibile to a traveler on the country road because it is behind his vehicle then the speed of the train overtaking the vehicle becomes a very important *factor* in determining *what constitutes the reasonable care on the part of the driver under the circumstances.* In addition, the speed is important in determining the duties of the railroad toward the general traveling public along and across its railroad tracks. The speed of the train is also an important factor in determining whether the railroad exercised that degree of care required of it toward the public.

Monforton knew that a train moving in the same direction had to travel a greater distance than he to reach the crossing. Monforton also knew the customary speed of the trains ordinarily operating over these particular tracks. Thus when a train was not in sight or hearing, he was entitled in the exercise of reasonable care to rely upon looking and listening.

Here the majority opinion places all the burden of care and caution upon the general traveling public and none upon the railroad. This was not the law of this jurisdiction prior to the majority decision herein.

The speed of this train is an important factor when determining the question of negligence and proximate cause. What did the members of defendant's train crew do when faced with the situation of their passenger train approaching the crossing and rapidly gaining upon the plaintiff's truck, also approaching the same crossing, but at a slower pace and in such manner that if one or the other did not change its rate of speed or stop, a collision was bound to occur? The engineer seated on the right side of the diesel engine pulling the train took no action for the

reason that the collision had occurred and plaintiff's truck had been wrecked before the engineer knew or even suspected what had happened. He did not ring the bell nor sound the horn, nor give any warning whatever that the train was approaching the crossing, notwithstanding he had observed one automobile approach and pass over the railroad crossing directly in front of him. So far as the plaintiff Monforton was concerned the engineer did absolutely nothing for the reason that he, at no time, saw the Monforton truck until after his engine had collided with and wrecked it.

According to the majority opinion, plaintiff Monforton was charged with the duty of constantly looking behind him in order to exercise the degree of care required of a reasonably prudent man, yet the defendant railroad, with impunity may operate its trains silently and without warning over and through crossings, which intersect widely traveled country roads.

The majority opinion herein implies that the defendant Railway Company is not charged with a duty to look and make effective their looking, or to ring a bell, sound a horn or otherwise give warning of its fast moving trains. The *fireman* whose duty it was to occupy a seat on the side of the engine's cab and to there watch for danger and immediately pass warning thereof on to the engineer, *did see the Monforton vehicle*. The defendant fireman testified as follows:

"Q. When did you first see the Monforton truck? A. I first noticed the truck when we were approximately a train length from the crossing. * * *

"Q. When you say you saw the truck about a train length away do you know about how many feet you are talking about. A. Well I would say approximately a thousand feet."

Here, the defendant's engine crew approaching the plaintiff's truck from the rear across this wide, open, unobstructed field did not see the truck until the truck was approximately 550 feet from the intersection. Monforton did not observe the

train approaching from his rear yet he is held negligent as a matter of law without any determination made as to whether his failure to see the train to his rear was the proximate cause of the accident. The fireman never communicated the fact to the engineer that the Monforton vehicle was approaching the intersection on the engineer's blind side. As to whether this would have been effective or not we have the testimony of the engineer as follows:

"Q. And had you taken the throttle off back a distance of not too far the train would have slowed down enough to have not hit the truck? A. No, I don't think that would have made any difference. But I wouldn't have any reason to have taken the throttle off because our time, we were late, and our time is fast on that train, and its my duty to make the best possible time on that class of train."

Yet the defendant's engineer also testified that if he had cut the throttle at a distance of *300 feet* from the intersection his train would have slowed down *8 or 10 miles per hour or enough to have avoided colliding with plaintiff's truck.*

As a true mathematical fact it is apparent that 15 seconds elapsed between the time the defendant's fireman testified he first saw the Monforton truck and the happening of the collision. In those 15 seconds the train could have been brought to a complete stop for the record shows that after the collision the brakes were applied, which stopped the train in approximately its own length being within about one thousand feet. However, the facts persist that the fireman did not warn the engineer of the impending accident for at least 15 seconds after he observed the plaintiff driving toward the crossing, and that the plaintiff was never warned by sound of bell, whistle or horn as he should have been by the defendant's engine crew.

The negligence on the part of the Railway Company, and its engine crew, constituting the proximate cause of the crash were:

(1) Failure of the defendant's engineer and fireman to keep a proper lookout;

(2) Failure of defendant's fireman upon observing the plaintiff proceeding toward the crossing to warn the engineer;

(3) Failure of the defendant's engineer to give any warning whatever at this established crossing of the approach of defendant's fast moving passenger train.

This action is based upon the negligence of the Northern Pacific Railway Company and its locomotive engineer, Henry Morris, in the operation of the Railway Company's passenger train as it approached and passed over an established railway crossing.

At and during the trial in the district court, and during the argument of the appeal before this court, the defendant Railway Company, and its locomotive engineer, admitted and conceded that they did not blow a whistle or ring a bell prior to reaching the crossing where the accident occurred, as required by the laws of the State of Montana, and by reason thereof, the defendants were guilty of negligence as a matter of law.

R.C.M. 1947, § 72-219, so far as pertinent here, provides:

"If any railroad corporation within this state shall * * * fail to have upon any locomotive in use by it in this state a bell and whistle in fit condition for use thereon; or shall permit any locomotive to approach any highway, road, or railroad crossing, without causing the whistle to be sounded at a point between fifty and eighty rods from the crossing, and the bell to be rung from said point until the crossing is reached; * * * shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be fined for the first offense in the sum of one thousand dollars, and for the second violation of the same provision, two thousand dollars, and for every other and further violation of any provision of which it has been twice before found guilty, a sum not less than five nor more than ten thousand dollars."

That which the majority opinion declares to be the rules and law governing railroad crossings in this state is indeed unique.

Not content with applying clear visibility, right angle crossing law to the facts here, the majority opinion goes a step further. It now invokes and imposes upon the traveling public in this state, the often repudiated stop, look and listen doctrine.

As early as 1912, in the case of Mason v. Northern Pacific Ry., 45 Mont. 474, 481, 124 P. 271, 273, this court set out the duty imposed upon the general traveling public when, in considering instructions having to do with the duty to look for approaching trains, it said:

"Neither of these instructions correctly states the law. They imposed too great a burden upon the plaintiff. If such were the law, a person approaching a railroad track would either be obliged to keep a constant lookout in both directions, or it would be incumbent upon him, in order to avoid the imputation of contributory negligence, *to stop,* if necessary, and look for a train at the last available point and at the last moment of time, before crossing the track. *The law is that one desiring to cross a railroad track must exercise reasonable care for his own safety. No other burden rests upon him."* Emphasis supplied.

This decision in the Mason case, supra, was followed in 1913 by the case of Walters v. Chicago, etc., Ry., 47 Mont. 501, 133 P. 357, 358, 46 L.R.A.,N.S., 702, wherein this court said:

"The testimony of respondent tended to show that, while he looked and listened as he approached the crossing, he did not 'stop, look and listen,' and the question is presented by appellants whether the driver of an automobile, approaching a railway crossing is not charged with the absolute duty to 'stop, look and listen.' The appellants, conceding that as to other vehicles using a public highway the general rule upon approaching a railway crossing is to exercise such care and caution as might be expected of an ordinarily prudent person under the circumstances, insist that 'the duty of an automobile driver approaching tracks where there is restricted vision, to stop, look and listen, and to do so at a

time and place where stopping, and where looking, and where listening will be effective, is a positive duty.' New York Central & H. R. Co. v. Maidment, 168 Fed. 21, 21 L.R.A. (N.S.) 794, 93 C.C.A. 413; Brommer v. Pennsylvania R. Co., 179 Fed. 577, 29 L.R.A. (N.S.) 924, 103 C.C.A.135.) Both of the decisions just cited emanated from the Circuit Court of Appeals for the Third Circuit, speaking through Judge Buffington, and they proceeded upon the mistaken ideas that a railroad has some sort of a paramount right to the use of a public highway crossing, and that whether a citizen using the highway on approaching such crossing must stop, look and listen, depends upon the motive power he is using and its amenability to control; whereas *the true rule,* as we understand it, *is that the citizen has an equal right with the railway company to use the crossing,* and the amenability to control of the motive power he is using bears more properly upon how near he may come to the place of danger before taking the precautions that common prudence generally requires. Of these cases nothing further need be said than this: If they are to be taken to hold, in the absence of express statute, that it is contributory negligence as a matter of law, for the driver of an automobile not to stop, look and listen before using a highway crossing, without regard to whether ordinary prudence would require such a course, they are contrary in spirit to the rule announced by the superior authority of the supreme court of the United States (Grand Trunk Ry. Co. v. Ives, 144 U.S. 408, 12 Sup.Ct. 679, 36 L.Ed. 485) are against the weight of general decision (Texas, etc., Ry. Co. v. Hilgartner [Tex.Civ.App.], 149 S.W. 1091; Pendroy v. Great Northern Ry. Co., 17 N.D. 433, 117 N.W. 531; Spencer v. New York Central & H. R. Co., 123 App.Div. 789, 108 N.Y.Supp. 245; Bonert v. Long Island R. Co., 145 App. Div. 552, 130 N.Y.Supp. 271; Hartman v. Chicago G. W. Ry., 132 Iowa 582, 110 N.W. 10; Louisville & N. R. Co. v.

Lucas, 99 S.W. 959, 30 Ky. Law Rep. 539; Vance v. Atchison, etc., Ry. Co., 9 Cal.App. 20, 98 P. 41; Missouri, etc., Ry. Co., v. James, 55 Tex.Civ.App. 588, 120 S.W. 269; Chesapeake & O. R. Co. v. Hawkins (Ky.), 124 S.W. 836), and are in conflict with the settled rule in this state. Mason v. Northern Pac. Ry. Co., 45 Mont. 474, 124 P. 271; Sprague v. Northern Pac. Ry. Co., 40 Mont. 481, 107 P. 412; Hunter v. Montana Central Ry. Co., 22 Mont. 525, 57 P. 140. In the Sprague Case appears the following: 'Whether, in selecting the point which they did select to stop and listen for approaching trains, Nelson and Chappel exercised ordinary care to make their listening effective, and *whether, in doing what they did from that point until the injury occurred, they exercised such care and prudence as reasonable men under like circumstances would have exercised, were questions of fact for the jury to determine.' "* Emphasis supplied.

In the instant case, the majority opinion declares that the above rules of law were repealed by a statute enacted in 1919, being R.C.M. 1947, § 72-164, but that such is not the fact is shown by the case of Jarvella v. Northern Pacific Ry., 101 Mont. 102, 115, 116, 53 P.2d 446, 451, decided in 1935. In the Jarvella case, the plaintiffs had collided with a train which was standing on a crossing. Therein this court said:

"As we understand defendant's further contention, it urges that any one who collides with a stationary train of cars on a crossing — a stationary train of cars on a crossing being itself a warning — is of necessity guilty of contributory negligence. Many cases may be found in the books holding, under varying circumstances, that plaintiffs colliding with a slowly moving train of cars or a train of cars which had been stopped on a crossing are guilty of contributory negligence. On the other hand, other cases under facts somewhat similar to those in question hold that *the question of contributory negligence is one of fact for the*

*jury.* It was so held where the question was raised on the pleadings in the cases of Central of Georgia Ry. Co. v. Heard, 36 Ga.App. 332, 136 S.E. 533, and Elliott v. Missouri Pac. Ry. Co., 227 Mo. App. 225, 52 S.W.2d 448; and a like result was declared where the question arose, as here, on a motion for nonsuit or directed verdict, in the cases of Nashville, C. & St. L. Ry. Co. v. Nall, 236 Ky. 554, 33 S.W.2d 640; Spiers v. Atlantic Coast Line R. Co., 174 S.C. 508, 178 S.E. 136, and Short v. Pennsylvania R. Co., 46 Ohio App. 77, 187 N.E. 737. See, also, 3 Blashfield's Cyc. Automobile Law, Perm. Ed., p. 210.'' Emphasis supplied.

Following the Jarvella case, supra, this court, in 1938, decided the case of Incret v. Chicago, M., St. P. Ry., 107 Mont. 394, 86 P.2d 12, wherein the plaintiff Incret collided with cars occupying a railroad crossing. The plaintiff actually hit a moving train. This court held that the plaintiff Incret was guilty of contributory negligence as a matter of law. A vigorous dissent was filed in that case in which it was pointed out that the rules applied by the majority opinion were amending the rules of law declared and adopted by this court in Walters v. Chicago, Milwaukee & Puget Sound Ry., supra.

Such was the status of the law until 1939 when this court decided the case of Walsh v. Butte, Anaconda, etc., Ry. Co., 109 Mont. 456, 466, 97 P.2d 325, 329. In that case the plaintiff's intestate had collided with a slowly moving train of cars at a railroad crossing. There, as here, the defendant railway company contended that contributory negligence, as a matter of law, barred recovery.

However, this court held that the case was controlled by the rules of law set out in Jarvella v. Northern Pacific Ry., supra, and specifically stated: ''Suggestion is made by plaintiff that we should overrule the statement appearing in the Incret case, supra, which seems to her to overrule the rule of the case of Walters v. Chicago, Mil. & P. S. Ry. Co., 47 Mont. 501, 133 P. 357, 46 L.R.A.(N.S.) 702. The Incret case does not overrule

the Walters case. *The rule in Montana still is as announced in the Walter's case."* Emphasis supplied.

Hard pressed for authority to sustain his position in the instant case District Judge H. B. Hoffman, author of the majority opinion, has seized upon a comforting quotation which his search revealed in the concluding words of section 72-164 of the Revised Codes of Montana of 1947, originally enacted as Section 1 of Chapter 151 of the Montana Session Laws of 1919, which statute reads as follows, viz.:

"72-164 (3842) *Railroad commission may order electric signal bells installed.* Authority is hereby given to the board of railroad commissioners of the state of Montana upon petition in writing made to it by any board of county commissioners of the state of Montana, to order railroad companies to install and maintain an electrically operated bell or other signaling device at all points in the state of Montana where the main lines, spurs, or switches of any railroad in continuous operation and use, owned or operated by them, cross any public highway now lawfully established or hereafter laid out within the state of Montana, and where the contour of the country adjacent to said crossing is such that a person approaching same along said highway cannot, at a distance of twenty-five feet of said crossing, obtain an unobstructed view of said railroad track for a distance of one-half mile on either side of said crossing; provided, however, all persons driving motor vehicles upon the public highways of this state, outside of corporate limits of incorporated cities or towns, *where the view is obscure, or when a moving train is within sight or hearing,* shall bring said vehicle to a full stop not less than ten nor more than one hundred feet from where said highway intersects railroad tracks within this state, before crossing the same, at all crossings where a flagman or a mechanical device is not maintained to warn the traveling public of approaching trains or cars." Emphasis supplied.

For years the rules of the Walters case, decided by this court on June 14, 1913, have been the rules which obtained in Montana.

*Judge Hoffman Changes the Rule.* Now some forty seven (47) years after this court's decision in the Walters case, District Judge Hoffman, speaking for a majority of this court, chooses to overrule the Walters case, and to change and abandon the long-established rules which govern in this jurisdiction, by wholly failing to recognize that section 72-164, supra, so enacted in 1919 does not change or alter the rules of the Walters case and that the provisions of section 72-164, supra, do not apply to the instant Monforton case, wherein the *view was not obscure, nor was the moving train within the sight of the plaintiff Monforton being conditions precedent* which *must* be found to exist before the portion of the provisions of section 72-164, quoted by District Judge Hoffman would or could become applicable.

One need only examine the particular factual situation which here obtained to discover that the instant Monforton case cannot be reconciled with those decisions wherein the plaintiff had been held to be guilty of contributory negligence as a matter of law.

The majority opinion, in the instant case, has written new law in Montana and it is bad law.

What is being accomplished by such majority opinion, in the instant case, is to impose a much greater burden upon the plaintiff Monforton than is imposed upon the defendants, the Northern Pacific Railway Company, and its engineer, Henry Morris, whose negligence in not looking ahead, and not giving any warning whatever of the passenger train's approach is clear and uncontroverted.

*The Law of This Case.* At the trial of this cause in the district court and after all the evidence had been introduced, the plaintiff Monforton offered an instruction designated as plaintiff's proposed Instruction No. 16, at which time the trial judge

inquired of defendant's counsel, "Do you have any objections?" to which Mr. Toole of counsel for the defendants replied: "No objection." Thereupon the trial judge announced: "It will be given without objection". Such proposed instruction was given to the jury as the court's Instruction No. 11.

Thus the court's Instruction No. 11, so given without objection, became, was and is the law of this case, and as such it is binding upon the parties litigant both plaintiff and defendants, their counsel, the trial judge, the jurors in the district court, and the justices sitting in the supreme court on this appeal.

The trial court's Instruction No. 11, so given is in these words, viz.:

"You are instructed that the defendants in this action admit that they did not blow a whistle or ring a bell prior to reaching the crossing where the accident occurred, as required by the laws of the State of Montana, and you are therefore instructed that the defendants were guilty of negligence as a matter of law for failure to blow a whistle or ring a bell as required by the laws of the State of Montana.

"If you find that such negligence of the defendants was the proximate cause of the collision, then, in that event, unless you find that the plaintiff was guilty of contributory negligence as defined in these instructions and further, that such contributory negligence was a proximate cause of the collision, then you must return a verdict for the plaintiff and against the defendants."

The two district judges, and the three duly elected justices who sat on this appeal, sat as lawyers and judges, and not as jurors. The *jury* of twelve in the district court *found* that *Monforton was not guilty of contributory negligence* and the two district *judges* and two *justices sitting* on the *appeal* have the *power,* but not the *right* to *overturn* the *jury's verdict* on the question of *contributory negligence.*

In conclusion, and as said by Mr. Justice Smith of the Su-

■■■ ■■■

preme Court of Michigan, in Sun Oil Co. v. Seamon, 349 Mich. 387, 84 N.W.2d 840, 841:

"In other words, we apply the doctrine of contributory negligence to shield the very person whose prior reckless acts caused the crisis which gave rise to negligence 'as a matter of law' on the part of plaintiff's driver. This is poor morals, poor government, and poor law all rolled into one, and while we have no primary jurisdiction in the first two fields, we have ample with respect to the third, and I urge that we use it."

I would affirm the verdict of the jury and the judgment of the district court.